UNITED STATES of America,
Plaintiff–Appellee,

v.

Debra Lynn SMITH, also known
as Debra Lynn Markarian,
Defendant–Appellant.

No. 93–3439.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 17, 1994.

Decided July 7, 1994.

Lawrence Beaumont, Office of U.S. Atty., Danville, IL (argued), for plaintiff-appellee.

Shari Goggin–Ward, Landau, Omahana & Kopka, Lisle, IL (argued), for defendant-appellant.

Before BAUER and CUDAHY, Circuit Judges, and MORAN, District Judge.*

BAUER, Circuit Judge.

In early summer on Canada's Vancouver Island in the rustic fishing and logging town of Campbell River, Beverly Anderson Pickering assembled a package of elk teeth, six cans of salmon, photographs, four cassette tapes, a deer rack, a piece of macrame jute, a thank-you card, and thirty eagle feathers. Pickering carefully wrapped the eagle feathers in paper towels and, on one of the towels, wrote: "Eagle feathers. Hope they make it okay."

On June 8 or 9, 1991, Pickering brought the package to a local post office. She insured the package and mailed it to the Decatur, Illinois home of her longtime friend Debra Lynn Smith. A week later, Pickering called Smith to tell her she had sent the package. Pickering said that the package was a surprise and that she had sent it as a gift. Pickering described the contents of the package and asked Smith if she had received it. Smith answered that she had not.

"Well," Pickering said, "I'll put a tracer on it to see if I can find it, see what happened, if they lost it in the mail."

In early August of 1991, Pickering went back to the post office to check on the package. A postal worker informed her that the post office had found no trace of the package and that it appeared lost. Pickering concluded that the package was lost forever, collected her insurance money, and called Smith

and explained that the package was lost and that she would try to send another one.

In fact, the package was not lost. On July 8, 1991, federal agents x-rayed the package at the O'Hare Airport international mail facility in Chicago. Senior Customs Inspector Melvin Soto looked at the x-rays, noted the varying shades of dark and light on the x-ray, and directed National Guardsman Michael Lester to "[o]pen it. We don't got nothing to lose."

Lester opened the package and he and Soto examined its contents. Soto called Michael Coffey, a biologist and wildlife inspector with the United States Fish and Wildlife Service, and the two of them discussed the contents of the package, especially the feathers. A few days later, on July 11, 1991, Coffey examined the package himself. Based on his experience, Coffey determined that the feathers were eagle feathers.

Special Agent Mike Damico of the United States Fish and Wildlife Service obtained a search warrant for Smith's house and made arrangements to make a controlled delivery of the package. The package was resealed and on Saturday, August 31, 1991, federal agents delivered the package to Smith's Decatur home. United States Postal Inspector Rod Damery, dressed in a mailman's uniform, placed a delivery form on the package to make it look like a regular delivery.

Damery knocked on Smith's front door and Smith answered. Damery explained that he had a special delivery and asked Smith to sign for it. When Smith realized the package was the one Pickering sent, she snapped, "Do you realize it's taken eight weeks for this package to get here?" Smith explained to Damery that she had been expecting the package from a friend in Canada.

Smith signed a receipt for the package, shut the door, and brought the package into her house. She set it on her dining room table, and began to open the package when Damico and four other armed federal agents went to her front door. Damico identified himself and his fellow agents, showed Smith

---

* The Honorable James B. Moran, Chief District Judge of the Northern District of Illinois, is sit-

ting by designation.

the search warrant, and Smith let them in her house. While Damico talked to Smith, the agents seized the contents of the package and searched the house. Damico asked Smith how she came to possess the feathers.

"My friend Bev sent them to me," Smith explained. "It's just a gesture of friendship. She thought I might like to have them."

Smith also told Damico that she knew it was illegal to possess eagle feathers because she once watched a television show that said as much. She said that the package contained the feathers, that they were indeed eagle feathers, and that she knew she was not supposed to possess them.

"I might as well tell you," she admitted, "that I asked for some of these feathers, but I wasn't expecting 30 of them." Additionally, Smith explained, "I expected to receive 1 or 2 feathers from [Pickering] in the parcel and thought I might attempt a macrame project."

Smith never attempted her proposed macrame project. Instead, the government prosecuted her for a variety of offenses. With Smith's consent, the case was tried before a magistrate judge pursuant to 18 U.S.C. § 3401. A jury found Smith guilty of possessing bald eagle feathers in violation of the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703, and acquitted her of three related charges. The Migratory Bird Treaty Act makes it "unlawful at any time, by any means or in any manner, to ... possess ... any migratory bird, any part ... or any product ... which consists, or is composed in whole or in part, of any such bird or any part ... thereof." 16 U.S.C. § 703. The bald eagle—our national symbol—is a migratory bird for purposes of the Migratory Bird Treaty Act. 50 C.F.R. § 10.13.

The magistrate judge sentenced Smith to probation and entered judgment on the conviction. Smith appealed her conviction directly to this court. We dismissed her appeal for lack of jurisdiction because Smith failed to seek review in the district court pursuant to 18 U.S.C. § 3402 and Rule 58(g)(2) of the Federal Rules of Criminal Procedure. *United States v. Smith,* 992 F.2d 98 (7th Cir.1993). On appeal to the district court, the court affirmed Smith's conviction.

■ In this appeal, Smith argues that the MBTA, as interpreted by the district court, violates the Fifth Amendment guarantee that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Smith claims that she did not have the requisite criminal intent to be convicted of a crime and that her conviction therefore violates the Due Process Clause. Smith also contends that she lacked any knowledge as to the contents of the package.

We begin with Smith's last contention. The record reveals that Smith knew that Pickering sent the package, that Pickering told her what the package contained, that the package had been "lost" in the mail, and that Smith complained about the length of time the package took to get to her Decatur home. The record also indicates that Smith asked Pickering to send her some eagle feathers that Smith planned to use as part of a macrame project and that Smith knew she was not supposed to possess eagle feathers.

Smith contends that, even so, she lacked any *criminal* intent or scienter. This is an interesting, though unavailing and somewhat confusing point. Smith urges us either to declare section 703 unconstitutional as violative of the Due Process Clause for this lack of requirement of scienter or, alternatively, to read the need for scienter into section 703. She does not claim, however, that section 703 of the MBTA requires a determination that she knew that possessing eagle feathers was illegal (although there is evidence that she in fact did so know).

■ Perhaps she means that she cannot be guilty if she did not know that she possessed eagle feathers. Smith accurately notes that scienter in some form is usually and traditionally a requirement of criminal responsibility. *United States v. Freed,* 401 U.S. 601, 607, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971). There are, however, many exceptions, especially in the regulation of activities involving public health, safety, and welfare. *Id.* Such regulatory offenses often do not and need not specify intent, particularly when the penalties for violations are small and do no grave harm to an offender's repu-

tation. *United States v. Engler,* 806 F.2d 425, 531 (3d Cir.1986), *cert. denied,* 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987). Conduct alone, without regard to intent, is often sufficient. *Lambert v. California,* 355 U.S. 225, 228, 78 S.Ct. 240, 242–243, 2 L.Ed.2d 228 (1957).

The plain language of section 703 of the MBTA makes it unlawful to "possess" bald eagle feathers. There is no scienter requirement expressly written into the statute. A number of courts have held that the MBTA provides for strict liability and that the provision does not offend the requirements of due process.[1] *See, e.g., Engler,* 806 F.2d at 436; *United States v. Manning,* 787 F.2d 431, 435 n. 4 (8th Cir.1986) ("[I]t is not necessary to prove that a defendant violated the Migratory Bird Treaty Act with specific intent or guilty knowledge."); *United States v. Catlett,* 747 F.2d 1102, 1104–05 (6th Cir.1984) (scienter not required for conviction pursuant to MBTA), *cert. denied,* 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985); *United States v. Ireland,* 493 F.2d 1208, 1209 (4th Cir.1973) (same).

■ Smith's argument, if she could make it, runs counter to those opinions. We do not reach it, however, because that is not an argument she can make. There is evidence that she expected to receive eagle feathers that she hoped to use for a macrame project. The jury was instructed that it must find that she knowingly possessed eagle feathers. Criminal offenses generally require no more; a person commits the offense when he or she knowingly engages in the conduct constituting the offense. And the jury here so determined.

■ Smith argues alternatively that her conviction amounts to punishment of wholly passive conduct, that the MBTA is vague or overbroad, and that for these reasons her conviction violates due process. *Lambert,* 355 U.S. at 228, 78 S.Ct. at 242–243; *Stepniewski v. Gagnon,* 732 F.2d 567, 571 (7th Cir.1984). Smith's argument is unconvincing.

To begin with, her conduct was not wholly passive. She admitted that she requested the feathers, she signed for the package, she complained that she had been waiting for it for eight weeks, and she said she planned on using the eagle feathers in a macrame project.

■ Moreover, section 703 is neither vague nor overbroad. Section 703 makes it "unlawful at any time, by any means or in any manner, to ... possess ... any part ... which consists, or is composed in whole or in part, of any [migratory] bird or any part ... thereof." 16 U.S.C. § 703. What could be more clear? Smith's argument is that "ordinary people cannot understand what conduct is prohibited under the possession portion of the MBTA." We are quite confident that ordinary people can understand section 703's clear and precise language. That language tells "ordinary people" this: if you possess any part of a migratory bird, you break the law. Smith possessed migratory bird parts. She therefore broke the law.

■ Smith raises one other claim—that the magistrate judge and the district court erred when they denied her motion to suppress the evidence of the eagle feathers which federal agents discovered when they searched the package at the airport. We review the denial of Smith's motion to suppress for clear error. *United States v. Packer,* 15 F.3d 654, 656 (7th Cir.1994).

■ The search at issue here, an airport search of a package sent from a foreign country into the United States, is the functional equivalent of an international border search. *United States v. Johnson,* 991 F.2d 1287, 1290 (7th Cir.1993). Federal agents are not restricted by Fourth Amendment standards when they conduct such routine searches. *United States v. Carter,* 592 F.2d 402, 404 (7th Cir.), *cert. denied,* 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979); *United*

1. The late Justice Oliver Wendell Holmes once pointed out the distinction between criminal and non-criminal intent: "Even a dog distinguishes between being stumbled over and being kicked." *Morissette v. United States,* 342 U.S. 246, 252 n. 9, 72 S.Ct. 240, 244 n. 9, 96 L.Ed. 288 (1952) (quoting Holmes, *The Common Law* ). In strict liability cases, like this one, both stumbling over and kicking a dog result in criminal liability.

*States v. Washington,* 586 F.2d 1147, 1153 (7th Cir.1978). Indeed, "[a]ny person or thing coming into the United States is subject to search by that fact alone, whether or not there be any suspicion of illegality directed to the particular person or thing to be searched." *United States v. Odland,* 502 F.2d 148, 151 (7th Cir.), *cert. denied,* 419 U.S. 1088, 95 S.Ct. 679, 42 L.Ed.2d 680 (1974). Smith's constitutional argument fails.

■ Smith also claims that the agents who opened the package sent by Pickering violated statutory and regulatory standards. She points to 19 U.S.C. § 482, which authorizes certain federal agents, like those that opened her package, to "search any trunk or envelope, wherever found, in which [the agent] may have a *reasonable cause to suspect* there is merchandise which was imported contrary to law." 19 U.S.C. § 482 (emphasis added). A variety of regulations implement, supplement, and explain section 482 and the "reasonable cause to suspect" standard. *See, e.g.* 19 C.F.R. §§ 145.2, 145.3, & 162.7. The "reasonable cause to suspect" standard "is ultimately a matter of judgment for each Customs official, based on all relevant facts and circumstances." 19 C.F.R. § 145 app. The regulations give several examples of cases where reasonable cause to suspect would exist, three of which are relevant to this case: (1) x-ray examination indicates the presence of merchandise or contraband; (2) the mail article is insured; and (3) the mail article is a box, carton, or wrapper other than a thin envelope. Examples 2, 5, & 6 to 19 C.F.R. § 145 app. Any one of these alone is sufficient to establish "reasonable cause to suspect;" all three are present here.

The agents who opened the package sent by Pickering had reasonable cause to suspect that merchandise—eagle feathers—was being imported contrary to law. The magistrate and the district court therefore properly denied Smith's motion to suppress.

Smith's conviction for possession of bald eagle feathers in violation of the Migratory Bird Treaty Act is

AFFIRMED.