**UNITED STATES of America, Plaintiff,**

v.

**Richard Nelson CORROW, Defendant.**

**CR No. 95–637 JP.**

United States District Court,
D. New Mexico.

Aug. 2, 1996.

---

Alonzo J. Padilla, Federal Public Defender's Office, Albuquerque, NM, for defendant.

Robert J. Gorence, U.S. Attorney's Office, District of New Mexico, Albuquerque, NM, for the U.S.

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

The subjects of this Memorandum Opinion and Order are: (1) Mr. Corrow's "Motion to Dismiss Count I" (doc. 7), filed January 25, 1996, which I denied in an oral ruling from the bench on April 19, 1996; (2) Mr. Corrow's "Motion for Judgment of Acquittal, Pursuant to Rule 29(c), after Discharge of Jury and Supporting Authorities" (doc. 47), filed May 3, 1996; and (3) a sentencing issue raised by Mr. Corrow in "Defendant's Objections to Presentence Report" (doc. # 56), filed June 27, 1996. The parties presented evidence on Mr. Corrow's motion to dismiss at pre-trial hearings held April 11, 1996, April 15, 1996 and April 19, 1996. The case was tried to a jury April 22 through April 26, 1996. After a careful review of the pleadings, facts and law, and the testimony and other evidence presented at the pre-trial hearings and at trial, I reaffirm my ruling denying Mr. Corrow's motion to dismiss Count I and deny Mr. Corrow's motion for judgment of acquittal. In addition, after thorough consideration of the pleadings and law, I conclude that Mr. Corrow's objection to the Presentence Report is well taken and that 18 U.S.C. § 3553(b) is applicable in determining Mr. Corrow's base offense level.

### I. Factual Summary:

Mr. Corrow, a non-Indian, was charged with the illegal trafficking of a set of Yei B'Chei (Navajo ceremonial masks[1]) in violation of the Native American Graves Protection and Repatriation Act ("NAGPRA") (Count I), and with knowingly offering to sell and/or possessing Golden Eagle, Great Horned Owl and Buteoine Hawk feathers in violation of the Migratory Bird Treaty Act (Count II). Mr. Corrow has studied the Navajo culture for a number of years and is a student of the Navajo religion. He has been collecting information and data that he may include in a book he has been writing about the Navajo culture. Mr. Corrow also has participated with different Navajo elders

---

1. At trial, Mr. Alfred Yazzie, a hataali, i.e., a Navajo medicine man, testified that the set should be referred to simply as Yei B'Chei or as Yei B'Chei jish but not as masks because the Navajo people consider the Yei B'Chei to be living gods. April 23, 1996 testimony of Mr. Yazzie at p. 196–97. Mr. Yazzie explained that it was also proper to refer to the Yei B'Chei as "jish." During trial other hataali described the set as Yei B'Chei masks or Yei B'Chei ceremonial masks. In addition, some hataali referred to the Yei B'Chei as "medicine bundles."

and hataali or chanters (medicine men[2]) in some of the traditional ceremonies at which the Yei B'Chei are used. Mr. Corrow was aware that the traditional Navajos view the set of Yei B'Chei not merely as masks, but as living gods.

The government alleged that Mr. Corrow, by coercion and misrepresentation, purchased a set of Yei B'Chei from Mrs. Fannie Winnie, the widow of hataali, Ray Winnie. The Winnies are from Lukachukai, Arizona. Over a period of 25 to 30 years, Mr. Winnie had used the Yei B'Chei in performing certain traditional Navajo ceremonies. He died in 1991 leaving no instructions to his widow or family about what to do with the Yei B'Chei.[3] Mr. Winnie apparently had acquired the Yei B'Chei from a Navajo clan, other than his own clan, during his hataali apprenticeship. April 23, 1996 testimony of Mr. Yazzie at pp. 217–18. The Yei B'Chei traditionally are passed from clan to clan or are loaned from one clan to another. No one knew who made these Yei B'Chei or their exact age.

On several occasions after Mr. Winnie's death, Mr. Corrow visited Mrs. Winnie to discuss the possible sale of the Yei B'Chei. In August 1993, Mrs. Winnie sold Mr. Corrow the set of Yei B'Chei along with certain accessories, including five headdresses made with eagle feathers, for $10,000.00 cash. Mr. Corrow received a handwritten sales receipt from Mrs. Winnie dated August 23, 1993 that stated, in full:

> Sold to Richard N. Corrow on this date for cash paid in full, all of the medicine bundles for yei be chai and fire dance

including masks owned by Hosteen Ray Winnie of Lukachuki, Az.

> Selling these medicine bundles or jish is the wife of the late Mr. Winnie, Fanny (sic), and his granddaughter Rose, and his great granddaughter, Harriet, whose signatures are below.

> The selling price is in cash of $10,000. Received by below this date.

The receipt was signed by Rose Bia and Harriette Keyonnie. There was also a thumbprint on the right side of the receipt. Ms. Bia testified that Mrs. Winnie, who does not read or write English, placed her thumbprint on the receipt after Ms. Bia read the contents of the receipt in Navajo to Mrs. Winnie. April 23, 1996 testimony of Ms. Bia at p. 131. However, Mrs. Winnie testified that she did not recall putting her thumbprint on the receipt. She also stated during trial that she hardly could see the thumbprint on the receipt. April 22, 1996 testimony of Mrs. Winnie at pp. 90–91.

After Mrs. Winnie sold the Yei B'Chei to Mr. Corrow, Mr. Bo Icelar, a half-owner of the East–West Trading Company[4] in Santa Fe, New Mexico, contacted Mr. Corrow to ask if Mr. Corrow might be interested in selling the Yei B'Chei to a private collector. Neither the East–West Trading Company nor Mr. Corrow were aware that the private collector actually was an undercover federal agent. Mr. Corrow initially declined to sell the Yei B'Chei, but in approximately November 1994, he told Mr. Icelar that he would sell the Yei B'Chei to the interested buyer for $50,000.00 in cash. April 23, 1996 testimony of Mr. Icelar at pp. 257–58. The East–West Trading Company was to act as the broker.[5]

---

**2.** Mr. Yazzie also testified that the Navajos do not use the term "medicine man" and instead would refer to the person who performs the traditional Navajo ceremonies as a chanter, cantor or singer. The Navajo word for chanter is "hataali." April 23, 1996 testimony of Mr. Yazzie at p. 194.

**3.** There was testimony at trial that it would be inconsistent with Navajo tradition to plan for death or to make provisions for possessions because to do so would insinuate the person's early death. April 24, 1996 testimony of Mr. Harry Walters at p. 29.

**4.** The East–West Trading Company is a general trading company that sells clothing and Native

American arts and crafts. Mr. Bo Icelar and Mr. Jim Luman each own fifty percent of the East–West Trading Company. Mr. Icelar and Mr. Luman individually entered guilty pleas to misdemeanors related to a previous sale of feathers to an undercover federal agent. In addition, Mr. Icelar and Mr. Luman entered a felony plea on behalf of the East–West Trading Company. As a part of their plea agreement, Mr. Icelar and Mr. Luman committed to testify for the government at Mr. Corrow's trial.

**5.** The private collector actually was to pay the East–West Trading Company $70,000.00 for the Yei B'Chei; East–West Trading Company, as the broker, planned to take $20,000.00.

Before the details of the sale were finalized, a representative of the East–West Trading Company showed Mr. James William Tanner, who was posing as the private collector, a large photograph supplied by Mr. Corrow that depicted 17 of the 22 Yei B'Chei to be sold. Several of the Yei B'Chei in the photograph had large feather headdresses which appeared to contain eagle and owl feathers. The photo also showed eagle and owl feathers alongside some of the Yei B'Chei and some sticks tied together with a small eagle feather at each corner of the photograph.

Mr. Tanner testified that he had told Mr. Jim Luman, the other half-owner of the East–West Trading Company, that he was interested in purchasing the Yei B'Chei along with the feathers and other items pictured in the photograph. Mr. Luman responded that East–West would sell the Yei B'Chei at one price and that the other objects, if available, would be sold separately. April 22, 1996 testimony of Mr. Tanner at p. 41–42. Mr. Tanner expected to purchase the Yei B'Chei and all of the other items depicted in the photograph that were available and any other religious objects that Mr. Corrow might bring with him. *Id.* at p. 44. However, Mr. Tanner agreed that neither Mr. Icelar nor Mr. Luman verbally offered to sell any feathers to him. *Id.* at p. 74. Mr. Icelar understood that Mr. Corrow had no intention of selling any feathers with the Yei B'Chei. April 23, 1996 testimony of Mr. Icelar at pp. 290–91, 293. In addition, Mr. Icelar believed that on the day of the intended sale, Mr. Corrow brought along in his suitcase other Native American art or cultural items solely for "show and tell" or educational purposes. *Id.* at p. 291.

On the morning of December 9, 1994, Mr. Corrow arrived at the Albuquerque International Airport from Arizona. He brought one large suitcase, one small suitcase or briefcase, and a cardboard box. Mr. Icelar met Mr. Corrow at the airport and drove him to the trading company in Santa Fe. Arrangements had been made for Mr. Tanner to be at the East–West Trading Company at 11:00 a.m. to buy the Yei B'Chei. The federal agents decided to execute the search warrant

before 11 a.m. because they learned through a confidential informant that during the morning of December 9th there was a great deal of suspicion among those at the East–West Trading Company. During the execution of the search warrant, the agents located Mr. Corrow's two suitcases in a storage building behind the East–West Trading Company building. One suitcase contained some Navajo religious articles, including small bundles, herbs, mini prayer sticks with eagle feathers tied to them, many loose eagle feathers and prayer hoops. April 22, 1996 testimony of Mr. Tanner at pp. 47–49, 51–57. There were also several rolled cloth bundles with eagle feathers inside and Yei B'Chei dance aprons. The agents found in one of the suitcases five headdress pieces made out of eagle feathers and what appeared to be owl feathers. After examining the contents of the suitcases, the agents saw a cardboard box within about four or five feet of the two suitcases. The cardboard box contained 22 Yei B'Chei. *Id.* at pp. 51–52. Mr. Tanner was not certain if there were any feathers with the Yei B'Chei, but he did not recall seeing any feathers in the box. *Id.* at pp. 75–76.

## II. Procedural Summary:

On April 26, 1996, after a trial before a jury that began April 22, 1996, the jury found Mr. Corrow guilty of Count I of the Indictment which charged Mr. Corrow with the illegal purchase and sale of Native American cultural items, known as Yei B'Chei, in violation of NAGPRA, 18 U.S.C. § 1170(b), 25 U.S.C. § 3001(3)(D), and 25 U.S.C. § 3002(c). In addition, the jury stated that it could not agree to a verdict regarding the crime charged in Count II of the Indictment, the felony offense of knowingly selling or offering to sell feathers of birds protected by the Migratory Bird Treaty Act, 16 U.S.C. § 703 and 16 U.S.C. § 707(b)(2). However, the jury returned a unanimous verdict of guilty on the lesser crime, included within Count II, of possession of feathers of birds protected by the Migratory Bird Treaty Act.

Before I submitted these issues to the jury, Mr. Corrow moved under Fed. R.Crim.P. 29(a) to dismiss Count II on the

ground of insufficiency of evidence. I reserved ruling on that motion under Fed. R.Crim.P. 29(b). After the trial, in an Order entered April 30, 1996, I ruled that the government's evidence was insufficient to sustain a conviction of knowingly selling or offering to sell the feathers of birds protected by the Migratory Bird Treaty Act as charged in Count II. However, I concluded that there was sufficient evidence for the jury to find, beyond a reasonable doubt, that Mr. Corrow was guilty of the lesser crime, included within Count II, of the possession of feathers of birds protected by the Migratory Bird Treaty Act.

### III. Mr. Corrow's Motion to Dismiss Count I for Unconstitutional Vagueness:

#### A. *Legal Standard:*

A statute may be found unconstitutional on its face and/or as applied to the individual who is challenging the law. *United States v. Gaudreau,* 860 F.2d 357, 360 (10th Cir.1988). At the April 11, 1996 hearing, counsel for Mr. Corrow clarified that he was challenging NAGPRA as it applied to Mr. Corrow.

When an individual attacks a statute "as applied," the court must examine the statute for vagueness in light of the conduct with which the defendant is charged. *Id.* at 361. A statutory provision is not void for vagueness if it unambiguously specifies the activity that is proscribed. *United States v. Batchelder,* 442 U.S. 114, 115, 99 S.Ct. 2198, 2199–2200, 60 L.Ed.2d 755 (1979). "[A] penal statute is void for vagueness if it: (1) fails to 'define the criminal offense with sufficient definitiveness [so] that ordinary people can understand what conduct is prohibited' or it (2) fails to 'establish minimal guidelines to govern law enforcement' so as to invite arbitrary and discriminatory enforcement." *United States v. Easter,* 981 F.2d 1549, 1557 (10th Cir.1992), *cert. denied,* 508 U.S. 953, 113 S.Ct. 2448, 124 L.Ed.2d 665 (1993). In addition, the United States Supreme Court has noted that in assessing a vagueness chal-

lenge, "no more than a reasonable degree of certainty about the scope of a statute is required, [n]or is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952). Moreover, "[t]here is a presumption of validity attaching to acts of Congress." *United States v. Agnew,* 931 F.2d 1397, 1404 (10th Cir.), *cert. denied,* 502 U.S. 884, 112 S.Ct. 237, 116 L.Ed.2d 193 (1991).

#### B. *The Native American Graves Protection and Repatriation Act:*

The purpose of NAGPRA is to protect Native American burial sites and the removal of human remains, funerary objects, sacred objects and cultural items. The bulk of NAGPRA is dedicated to repatriation. However, section 4 of NAGPRA amended the United States Criminal Code to create the misdemeanor offense [6] of illegal trafficking in Native American human remains and cultural items.

18 U.S.C. § 1170(b) provides the penalties for anyone who violates NAGPRA. It states in pertinent part:

> Whoever knowingly sells, purchases, uses for profit, or transports for sale or profit any Native American *cultural items* obtained in violation of the Native American Grave (sic) Protection and Repatriation Act shall be fined . . ., imprisoned not more than one year, or both. . . .

18 U.S.C. § 1170(b) (emphasis added).

18 U.S.C. § 1170 does not define "cultural items." However, NAGPRA contains a four-part definition of "cultural items."

> "(3) 'Cultural items' means human remains and—
>
> > (A) 'associated funerary objects . . .'
> >
> > (B) 'unassociated funerary objects . . .'
> >
> > (C) 'sacred objects . . .,' and
> >
> > (D) 'cultural patrimony. . . .' "

---

**6.** The first offense is a misdemeanor. A subsequent violation of NAGPRA is a felony, with a maximum penalty of five years in prison.

25 U.S.C. §§ 3001(3)(A)(B)(C) & (D). The government argues that the Yei B'Chei are "cultural items" in the category of "cultural patrimony." [7]

25 U.S.C. § 3001(3)(D) defines "cultural patrimony" as:

> ... an object having ongoing historical, traditional, or cultural importance central to the Native American group or culture itself, rather than property owned by an individual Native American, and which, therefore, cannot be alienated, appropriated, or conveyed by any individual regardless of whether or not the individual is a member of the Indian tribe ... and such object shall have been considered inalienable by such Native American group at the time the object was separated from such group. .

25 U.S.C. § 3002(c) provides that the intentional removal of "cultural items" from tribal lands is permissible only if done with (1) a permit; (2) consent of the tribe and/or owners; *and* proof of tribal consent.[8] (emphasis added).

### C. *Mr. Corrow's Position:*

Mr. Corrow argues that the definitions of "cultural items" and "cultural patrimony" did not give him fair notice of what objects are inalienable under · NAGPRA. He further states that "there is nothing unique about [the Yei B'Chei] that would give any person notice of their 'ongoing historical, traditional or cultural importance,' their cultural patrimony or their inalienability." Defendant's brief at p. 6. In other words, Mr. Corrow maintains that the definitions in NAGPRA fail to give a person of ordinary intelligence

fair notice that the contemplated conduct is forbidden. In addition, Mr. Corrow contends that NAGPRA encourages arbitrary and discriminatory enforcement because law enforcement personnel would be unable to determine which objects fit within the statutory definitions of "cultural items" or "cultural patrimony."

### D. *Analysis:*

NAGPRA took effect on November 16, 1991. To date, there have been no published court opinions interpreting "cultural items" or "cultural patrimony" as those terms appear in NAGPRA. Both parties agree that the case law examining specific language in the Antiquities Act, 16 U.S.C. § 433, *et seq.*, may furnish a useful comparison to provisions of NAGPRA. The Antiquities Act was a precursor to NAGPRA and was the first legislation establishing criminal sanctions intended to protect Native American objects of historic and cultural importance. One of the fatal shortcomings of the Antiquities Act was its vague definitions, in particular, its definition of "object of antiquity." NAGPRA was intended, in part, to solve the problems of vagueness from which the Antiquities Act had suffered. Sherry Hutt, *Illegal Trafficking in Native American Human Remains and Cultural Items: A New Protection Tool,* 24 Arizona State Law Journal at 140. In addition, NAGPRA's penalty provisions were expected to result in greater deterrence. *Id.* at 140–41.

In *United States v. Smyer,* 596 F.2d 939, 940–41 (10th Cir.), *cert. denied,* 444 U.S. 843, 100 S.Ct. 84, 62 L.Ed.2d 55 (1979), the defen-

---

**7.** The plain language of 25 U.S.C. § 3001(3) might be interpreted to mean that a "cultural item" must be both human remains plus either an "associated funerary object," an "unassociated funerary object," a "sacred object" or ."cultural patrimony." However, Mr. Corrow did not raise this argument. · In addition, the author of an article discussing the purposes of NAGPRA states that "NAGPRA protects two types of items: human remains and cultural items. Although the definition of cultural items includes human remains, the criminal law separates the two...." Sherry Hutt, *Illegal Trafficking in Native American Human Remains and Cultural Items: A New Protection Tool,* 24 Ariz.St.L.J. 135, 143 (Spring 1992).

I also note that the government apparently does not contend that the Yei B'Chei are "sacred objects" as defined by 25 U.S.C. § 3001(3)(C). Instead, the Indictment charges that the Yei B'Chei are inalienable objects "having ongoing, historical, traditional, and cultural importance central to the Navajo Native American culture." Hence, the government alleges that the Yei B'Chei are "cultural items" that fit the definition of "cultural patrimony."

**8.** Mr. Corrow does not contend that he obtained a permit or tribal consent to buy and sell the Yei B'Chei.

dants excavated a prehistoric Mimbres ruin at an archeological site and were charged with removing certain "objects of antiquity" in violation of the Antiquities Act. The defendants argued that the Antiquities Act was unconstitutionally vague. The Antiquities Act provided that:

> Any person who shall appropriate, excavate, injure, or destroy any historic or prehistoric ruin or monument, or any object of antiquity, situated on lands owned or controlled by the Government of the United States ... shall, upon conviction, be fined in a sum of not more than $500 or be imprisoned....

The Tenth Circuit rejected defendants' argument that the words "ruin" and "antiquity" as used in the Antiquities Act were unconstitutionally vague. The court looked to the Webster's New International Dictionary definitions of those words. "When measured by common understanding and practice, the challenged language conveys a sufficiently definite warning as to the proscribed conduct." *Id.* at 941. The court emphasized that the excavated objects were about 800 to 900 years old and were taken from ancient sites for commercial motives. *Id.* In addition, the court explained that "[w]e do not have a case of hobbyists exploring the desert for arrow heads." *Id.*

The Tenth Circuit, in *Smyer*, distinguished the decision in *United States v. Diaz*, 499 F.2d 113 (9th Cir.1974), in which the Ninth Circuit Court of Appeals held that the Antiquities Act was unconstitutionally vague. At issue in *Diaz* were objects that were only three or four years old unlike the Mimbres pottery in *Smyer* that was centuries old.

In *Diaz*, the defendant was charged with appropriating face masks he found in a cave on the San Carlos Indian Reservation in Arizona. An expert testified that the face masks were made in 1969 or 1970. The Ninth Circuit observed that the Antiquities Act did not limit itself to Indian reservations or to Native American relics. The court was concerned that "[h]obbyists who explore the desert and its ghost towns for arrow heads and antique bottles could arguably find them-

selves within the Act's proscriptions." *Id.* at 114. The court concluded that the Act's "undefined terms of uncommon usage" were fatally vague. *Id.* at 115.

### 1. *Fair Notice to Mr. Corrow:*

■ The focus of my analysis here is whether the term "cultural patrimony," which is a category of "cultural items" as defined in NAGPRA, gave Mr. Corrow fair notice that the conduct he engaged in was illegal. Mr. Corrow argued orally at the April 11, 1996 motion hearing that the definition of "cultural patrimony" did not put him on notice of what items might be considered "property owned by an individual Native American...." A plain reading of the definition of "cultural patrimony" appears to exclude property owned by an individual Native American from being classified as "cultural patrimony," and, therefore, from being inalienable. " 'Cultural patrimony' ... shall mean an object having ongoing historical, traditional, or cultural importance ..., *rather than property owned by an individual Native American, and which, therefore, cannot be alienated ... by any individual....*" 25 U.S.C. § 3001(3)(D) (emphasis added).

At trial the parties presented conflicting evidence from several hataali and other witnesses regarding whether the Yei B'Chei were the property of the widow, Mrs. Winnie, of a Navajo clan other than the clan of Mr. Winnie, or of the Navajo Nation. Alfred Yazzie, a hataali called by the government, stated that upon the death of a chanter, the Yei B'Chei used to perform ceremonies would become the property of the tribe or would be returned to the clan of the original owner. April 23, 1996 testimony of Mr. Yazzie at pp. 213, 218, 220. Harry Walters, another government witness and hataali, expressed his opinion that there is no such thing as ownership of medicine bundles.[9] April 24, 1996 testimony of Mr. Walters at p. 16. "[T]he jish belongs to the Navajo people because they are the only people that can get full benefit from that." *Id.* at p. 42. Mr. Walters also stated that the Yei B'Chei could be transferred to another person but only to a person trained in the traditional Navajo ways who knew how to use them. *Id.* at p.

---

**9.** Yei B'Chei also are referred to as medicine    bundles.

41. However, Mr. Walters admitted that because the Western European way has been imposed on the Native Americans, some of the Navajos believe that the widow of a hataali would own the Yei B'Chei. *Id.* at pp. 43–44. Nonetheless, Mr. Walters opined that it would be sacrilegious to sell the Yei B'Chei to an individual who intended to remove the Yei B'Chei from the four corners of the Navajo Nation.[10] *Id.* at p. 50.

Mrs. Winnie believed that after her husband died, the Yei B'Chei became her property and she had the right to sell them. April 22, 1996 testimony of Mrs. Winnie at p. 97. Mr. Jackson Gillis, a hataali called by Mr. Corrow, explained that the Yei B'Chei would become the property of the widow if not claimed by someone who was trained to use the Yei B'Chei or who was from the hataali's clan and knew how to use the Yei B'Chei. April 24, 1996 testimony of Mr. Gillis at p. 91. Mr. Gillis also stated that if no appropriate claims were made, the widow could sell the Yei B'Chei if she did not feel comfortable keeping them. *Id.*[11] Mr. Corrow also called Mr. Billy Yellow, another Navajo hataali, to testify about the transfer and sale of the Yei B'Chei. Mr. Yellow explained that under the traditional Navajo way, if a hataali dies, his jish should go to his children, or his grandchildren, or to his spouse if there are no children or grandchildren. April 24, 1996 testimony of Mr. Yellow at pp. 112, 121. If the jish were to go the widow of the hataali, the widow would have the right to sell them. *Id.* at pp. 113, 121–22. In addition, Mr. Harrison Begay, an apprentice to a hataali, testified that the Yei B'Chei would pass to the widow of a hataali if no one came forward to claim the Yei B'Chei.[12] April 24, 1996 testimony of Mr. Begay at pp. 132–33.

However, on cross-examination, Mr. Gillis agreed that the Yei B'Chei should remain within the Navajo Nation and that Mrs. Winnie was required to sell the Yei B'Chei "only to someone who agrees to properly take care of them and [who] knows how to do that." *Id.* at p. 97. In addition, Mr. Yellow conceded on cross-examination that because the Yei B'Chei are alive and actual gods, nobody can truly own them. April 24, 1996 testimony of Mr. Yellow at p. 117.

Notwithstanding the conflict in the evidence regarding whether Mrs. Winnie, a particular Navajo clan, or the Navajo Nation owned the Yei B'Chei, the statutory language in 25 U.S.C. § 3001(3)(D) is clear that "cultural patrimony" is inalienable unless it is owned by an individual Native American. There is little or no written law within the Navajo culture about the ownership of property or how property passes after an individual's death. Traditional, oral Navajo law appears to govern the ownership of property.

Although it may be uncertain whether an item is owned by an individual Navajo, a Navajo clan or the tribe, unquestionably Mr. Corrow, who is knowledgeable about the traditions of the Navajo people, would have been aware that various tribal members viewed ownership of property differently. Furthermore, Mr. Corrow would have been on notice from the language in NAGPRA that ownership of an item must be ascertained before its purchase or sale would be permitted.[13] In addition, I note that I am to

---

10. Mr. Yazzie defined the four corners as "the four cardinal mountains of the east, the south, the west and the north which involves Mount Blanca, Mount Taylor, San Francisco Peak and the Hesperus Peaks in Colorado." April 23, 1996 testimony of Mr. Yazzie at p. 190. Mr. Yazzie explained further that "the gods were summoned on those sacred mountains during the ceremony from the four directions. It [the Yei B'Chei set] cannot be used outside the boundaries, it has been done before and those that had done it didn't live very long." *Id.* at pp. 190–91.

11. On cross-examination, Mr. Gillis explained that he did not use the Yei B'Chei or "mask jish" to perform Navajo ceremonies; instead, his jish were beads and pots. *Id.* at pp. 93–94.

12. Mr. Begay's testimony was admitted over the government's objection that his testimony was cumulative.

13. Ms. Charlotte Frisbie, author of *Navajo Medicine Bundles or Jish: Acquisition, Transmission and Disposition in the Past and Present* (1987), testified that Mr. Corrow called her on several occasions at the end of 1991 and early in 1992 to ask her what she knew about the prices of certain Navajo artifacts. Mr. Corrow did not ask about the Yei B'Chei kept by Mrs. Winnie which he had not acquired at the time he called Ms. Frisbie. Ms. Frisbie stated that she told Mr. Corrow that she was not in favor of Native American cultural objects being sold in the open mar-

**1562**

examine the alleged vagueness of the terms "cultural items" and "cultural patrimony" as applied to the conduct of Mr. Corrow and not as applied to the conduct of others. *See United States v. Austin,* 902 F.2d 743, 745 (10th Cir.) (the defendant maintained that the terms "weapons" and "tools" were fatally vague as defined by the Archaeological Resources Protection Act; the court stated it was concerned only with the possible vagueness of the law as it applied to that defendant and not as it applied to others), *cert. denied,* 498 U.S. 874, 111 S.Ct. 200, 112 L.Ed.2d 161 (1990). *See also United States v. General Nutrition, Inc.,* 638 F.Supp. 556, 564 (W.D.N.Y.1986) (explaining that it was not unreasonable to expect persons in the business of selling products for human consumption to recognize the possible criminality of their conduct violating the Food, Drug and Cosmetic Act). For these reasons, Mr. Corrow would have had fair notice of the need to verify the ownership of items such as the Yei B'Chei with the tribe as well as with Mrs. Winnie. In acting otherwise, Mr. Corrow risked violating the statute. The Tenth Circuit, in examining a challenge to the constitutionality of a statute, has quoted the following language:

> Laws cannot define the boundaries of impermissible conduct with mathematical certainty. 'Whenever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, and if he does so it is familiar to the criminal law to make him take the risk.'

*United States v. Agnew,* 931 F.2d at 1404 (citing *Gaudreau,* 860 F.2d at 363 n. 17) (internal citation omitted). At a minimum, Mr. Corrow knew how close to the line he

treaded when he relied only on Mrs. Winnie's word and belief that she owned the Yei B'Chei.

Mr. Corrow also challenged as unconstitutionally vague the language in NAGPRA that defines "cultural patrimony" as "an object having ongoing historical, traditional, or cultural importance" to the Native American tribe. Mr. Corrow argued in his brief that there is "nothing unique" about the Yei B'Chei that would give any person notice that the Yei B'Chei have ongoing traditional or cultural importance. All of the testimony at trial about the Yei B'Chei refutes Mr. Corrow's argument that the Yei B'Chei were "nothing unique." The evidence presented by both parties eliminated any question about the Yei B'Chei having great traditional and cultural significance to the Navajo people. The Navajos consider the Yei B'Chei to be living gods. "[T]hey don't impersonate the Gods but they personate the Gods, which means that when they are doing their performance they are the actual Gods." April 23, 1996 testimony of Mr. Yazzie at pp. 195–96. "[W]e don't call them masks, we call them Gods, we call them jish." *Id.* at p. 196. Regarding the Nightway ceremony at which the Yei B'Chei are used, the traditional Navajo people would say: "This is my heartbeat, this is my life, this is my teaching. This causes me to behave right. It allows me to teach my children to behave." *Id.* at 197. "[The Yei B'Chei] represent the wind spirits, or like one called Talking God. They represent the aging, the changing of things, the day to day, the lifespan of a person, ... not only humans but plants and the universe itself." *Id.* at p. 200.[14]

None of the hataali or experts were able to pinpoint the exact age of the Yei B'Chei.

ket by dealers and commercial handlers. She claimed to have informed Mr. Corrow that the Navajo Nation already had set up certain procedures to allow for the return of these items to the tribe and suggested that Mr. Corrow avail himself of these procedures. During one of these phone calls that occurred after NAGPRA went into effect in November of 1991, Ms. Frisbie reminded Mr. Corrow that NAGPRA was in place and that it prohibited the commercial sale of Native American cultural resources. April 23, 1996 testimony of Ms. Frisbie at pp. 346–350, 355–356.

14. Because of their meaning to the Navajo people, the actual Yei B'Chei were not introduced as exhibits at trial. Instead, only Mr. Corrow's photograph of the Yei B'Chei was shown to the jury. Even this was offensive to some traditional Navajos, but it was an evidentiary compromise acceptable to the defendant. The Yei B'Chei were kept inside a closed box in the courtroom and only the Hataali witnesses viewed them to verify their authenticity.

However, Mr. Winnie used the Yei B'Chei for thirty years or more while he practiced as a hataali. Testimony of Mr. Harry Walters, April 24, 1996 at pp. 26–27. Mr. Yazzie testified that the original owner of these Yei B'Chei was a man known as Hosteen Hataali Walker. April 23, 1996 testimony of Mr. Yazzie at p. 210. Mr. Yazzie also explained that Hosteen Hataali Walker had ordained several hataali including Mr. Yazzie's grandfather. *Id.* Mr. Yazzie described his own age as "pushing 63 or 64." *Id.* at p. 219. Therefore, the age of the Yei B'Chei is at least thirty years and probably is over one hundred years.

There was also an explanation at trial about how the Yei B'Chei are maintained and repaired or restored. Mr. Harry Walters stated that any restoration work must be done by the hataali during the ceremonies. April 24, 1996 testimony of Mr. Walters at p. 9. If the Yei B'Chei break or wear out, the hataali physically returns the Yei B'Chei to nature. *Id.* at pp. 45–46. A long process is involved in making a Yei B'Chei set. April 23, 1996 testimony of Mr. Yazzie at pp. 211–12.

The testimony about the significance of the Yei B'Chei to the Navajo people, the age of the Yei B'Chei and the way the hataali make and maintain the Yei B'Chei supports my conclusion that Mr. Corrow had fair notice that the Yei B'Chei were items of "ongoing historical, cultural and traditional importance" and had fair notice that his conduct of buying and offering to sell the Yei B'Chei was prohibited by NAGPRA. Again, I must look at the alleged vagueness of NAGPRA as it is applied to Mr. Corrow's actions rather than to the conduct of others who might not be familiar with the Navajo culture. Mr. Corrow understood the value of the Yei B'Chei to the commercial world and to the Navajo Nation. He set a price of $50,000.00 for the Yei B'Chei. Mr. Corrow had participated in ceremonies during which Navajo hataali performed with the Yei B'Chei. In addition, Mr. Corrow has studied the Navajo culture and religion for years.

Furthermore, I find that the opinion in *Smyer*, in which the Tenth Circuit ruled that the statutory provisions of the Antiquities Act conveyed sufficient warning as to the proscribed conduct, supports the conclusion that Mr. Corrow received fair notice from NAGPRA of what conduct that statute forbids. Similar to the *Smyer* defendants who excavated objects that were centuries old for commercial purposes, Mr. Corrow bought and offered for sale the Yei B'Chei which most likely were over one hundred years old. The facts in this case are readily distinguishable from those in *Diaz*, in which the defendants appropriated face masks that were only three or four years old. Moreover, in *Diaz*, the Ninth Circuit was concerned that the Antiquities Act might affect the conduct of hobbyists who search the desert for arrowheads. Mr. Corrow's activities in offering to sell the Yei B'Chei for $50,000.00 cannot be likened to those of a hobbyist. Finally, even if a statute is vague, the Supreme Court has recognized "that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). NAGPRA prohibits the *knowing* sale or purchase of a Native American cultural item.[15] I conclude that the challenged provisions of NAGPRA gave Mr. Corrow fair notice that the buying and selling of the Yei B'Chei were outlawed.

### 2. *Enforcement of NAGPRA:*

■ I must also examine whether NAGPRA encourages arbitrary and discriminatory enforcement, and is unconstitutionally vague for that reason. At the April 19, 1996 motion hearing, Mr. Phillip Young, an employee of the United States Department of Interior National Park Service, testified about his involvement in the investigation of this case. Early in the investigation, Mr. Young was given the photograph that depicted the Yei B'Chei and other religious items. Mr. Young examined the photograph and reviewed written materials about the Yei

**15.** Number 6 of the Instructions to the Jury sets forth the elements of 18 U.S.C. § 1170 that the government was required to prove beyond a reasonable doubt, including that Mr. Corrow "knowingly sold, purchased, used for profit or transported for sale and profit" the Yei B'Chei.

B'Chei supplied by the East–West Trading Company to the undercover agent, Mr. Tanner. Mr. Young also discussed the Yei B'Chei with Mr. Tanner, Mr. Dave Burgee, a retired Park Service curator and specialist in Navajo culture, and Mr. William Yazzie, a National Park Service law enforcement ranger. In addition, Mr. Young spoke with persons in the Navajo Nation and Historic Preservation Department and several Navajo hataali. Based on this information, Mr. Young concluded that the Yei B'Chei were items having "ongoing historical, traditional or cultural importance" to the Navajo people.

Mr. Young also testified that he had been involved in three or four other NAGPRA investigations before this case. He explained that in each of these cases, he sought out and gained information from Native American individuals who could provide information to him about the objects in question. April 19, 1996 testimony of Mr. Young at p. 32.

■ I recognize that NAGPRA does not list examples that would fall within the definitions of "cultural items" or "cultural patrimony." However, I also realize that Navajo law primarily is passed on through oral traditions. Little of Navajo law is written. In addition, it would seem almost impossible to provide an exhaustive list of items that would have "ongoing historical, traditional and cultural importance" to every Native American tribe. I am persuaded that the definition of "cultural patrimony" sufficiently prevents arbitrary and discriminatory application of the law, because it is clear from the testimony of Mr. Young that law enforcement officers are aware they first must consult with a Native American tribe to determine if an item has "ongoing historical, traditional or cultural importance" to that tribe. In addition, it is apparent from the language of the statute that law enforcement personnel also must decide whether or not an item is property owned by an individual Native American because if it is the item is alienable. Here, Mr. Young testified that law enforcement officers carefully consulted with knowledgeable members of the Navajo Nation to verify the importance of the Yei B'Chei. I conclude, therefore, that the statutory language of NAGPRA defining "cultural patrimony" provides sufficient objective guidance to law enforcement personnel to avoid the likelihood of arbitrary enforcement. "Effective law enforcement often 'requires the exercise of some degree of police judgment.'" *United States v. Murphy,* 977 F.2d 503, 506 (10th Cir.1992), *abrogated on other grounds,* 511 U.S. 513, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994). "[T]he fact that different minds may reach different results when seeking to determine whether a given object falls within the statutory definition ... does not render the statute void for vagueness." *Id.* (citation omitted). Because NAGPRA gave Mr. Corrow fair notice of the proscribed conduct and provided law enforcement officers with sufficient guidance to avoid the possibility of arbitrary application, I reaffirm my oral ruling denying Mr. Corrow's motion to dismiss Count I.

## IV. Mr. Corrow's Motion for Judgment Acquittal on Count I and Count II:

### A. *Legal Standard:*

In deciding whether there was sufficient evidence to support the verdicts of guilty on Count I and Count II, I must examine the evidence and determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational [jury] could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *See also United States v. Garcia–Emanuel,* 14 F.3d 1469, 1472 (10th Cir.1994) ("[T]he evidence, both direct and circumstantial, together with reasonable inferences to be drawn therefrom, is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendants guilty beyond a reasonable doubt. Further, the evidence presented to support the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt.") (citing *United States v. Sanders,* 928 F.2d 940, 944 (10th Cir.), *cert. denied,* 502 U.S. 845, 112 S.Ct. 142, 116 L.Ed.2d 109 (1991)).

## B. *Analysis:*

### 1. *Count I—NAGPRA violation:*

██ Mr. Corrow contends that the government did not present any evidence to contradict the testimony of Mrs. Fannie Winnie that she was the sole owner of the Yei B'Chei and entitled to sell them after her husband died. Mr. Corrow maintains that the testimony of the hataali confirmed that under traditional oral Navajo law, the Yei B'Chei became the property of the widow if no one in the family or clan who was trained to use the Yei B'Chei claimed them. Mr. Corrow asserts that there was no testimony to refute his argument that the Yei B'Chei fell outside the statutory definition of "cultural patrimony" because the Yei B'Chei were property owned by "an individual." Hence, Mr. Corrow argues that there was not sufficient evidence to support a verdict of guilty that he bought and sold the Yei B'Chei in violation of NAGPRA.

The conflicting testimony presented at trial regarding who would own a hataali's Yei B'Chei after he dies is detailed above. *See* discussion *supra* at pp. 1560–1561. Several Navajo chanters testified that upon a hataali's death, the Yei B'Chei he used would become the property of the Navajo Nation or of a particular Navajo clan. Another hataali explained that the widow of the hataali would have the right to sell the Yei B'Chei to someone outside the Navajo Nation provided no trained Navajo individual claimed the Yei B'Chei. However, Mrs. Winnie testified that "[t]here was another man that knew the ways and he had asked of [the Yei B'Chei] but I was the one that was stalling and ended up selling it." April 22, 1996 testimony of Mrs. Winnie at p. 96. Mrs. Winnie stated that the other man had not offered her any money for the Yei B'Chei and that he had trained with her husband as a hataali. *Id.*

After reviewing this evidence in the light most favorable to the government, I conclude that a rational jury could find, beyond a reasonable doubt, that Mrs. Winnie did not have ownership rights to the Yei B'Chei, and, therefore, that Mr. Corrow had violated NAGPRA by buying and selling the Yei B'Chei. Hence, Mr. Corrow's motion for judgment of acquittal on Count I should be denied.

### 2. *Count II—the Migratory Bird Protection Act:*

██ Mr. Corrow also contends that there was insufficient evidence to support his conviction on the lesser offense included within the crime charged in Count II—the knowing possession of the feathers of a bird protected by the Migratory Bird Treaty Act. Mr. Corrow argues that there was no evidence to support the allegation that Mr. Corrow knew the feathers that were seized on December 9, 1994, were illegal to possess under the Migratory Bird Treaty Act. However, the question is not whether Mr. Corrow knew it was illegal to possess the feathers. Instead, the critical inquiry is whether Mr. Corrow "knowingly possessed" the feathers of birds protected by the Migratory Bird Treaty Act. *See* Jury Instruction No. 11.

There was ample testimony at trial that Mr. Corrow knew he possessed feathers of eagles and owls, both of which are protected by the Migratory Bird Treaty Act. Mrs. Winnie testified that she sold certain feathers to Mr. Corrow as a part of the headdresses that are worn with the Yei B'Chei. April 22, 1996 testimony of Mrs. Winnie at pp. 91–92. Mr. Corrow included feathers in the photograph of the Yei B'Chei that he supplied to the East–West Trading Company. On the day the federal agents executed the search warrant at the East–West Trading Company, the agents found in Mr. Corrow's suitcases feathers that had been depicted in the photograph and that Mrs. Winnie had sold to Mr. Corrow as a part of the Yei B'Chei set.[16] Ms. Beth Ann Sabo, a forensic

---

**16.** In addition, although there was not any evidence presented at trial that Mr. Corrow intended to sell the feathers, there was testimony that he knew that certain feathers could not be sold legally. Mr. John J. Loughey, a special agent with the FBI, testified that he went to Mr. Corrow's address in Scottsdale, Arizona where Mr.

Corrow told him he was unaware that the people at East–West Trading Company were selling feathers "because any idiot knows that is illegal to sell feathers." April 23, 1996 testimony of Mr. Loughey at pp. 311–12. A jury might reasonably infer that if Mr. Corrow knew it was illegal to sell certain feathers, he also knew or should have

ornithologist, identified the feathers in one of the medicine bundles sold to Mr. Corrow by Mrs. Winnie as belonging to a golden eagle. April 23, 1996 testimony of Ms. Sabo at p. 305. Ms. Sabo classified other feathers in the medicine bundle as feathers of gray horned owls. *Id.* at p. 306. In addition, Ms. Sabo recognized the feathers depicted in the four corners of Mr. Corrow's photograph as feathers of a golden eagle. *Id.* at p. 307.

Furthermore, the plain language of 16 U.S.C. § 703 makes it unlawful simply to *possess* feathers protected by the Migratory Bird Treaty Act. *United States v. Smith*, 29 F.3d 270, 273 (7th Cir.1994). 16 U.S.C. § 707(a), which does not expressly require proof of scienter, prohibits the possession of certain feathers.[17] "A number of courts have held that the MBTA provides for strict liability and that the provision does not offend the requirements of due process." *Id.* (citations omitted).

Notwithstanding the statute's lack of a scienter requirement, I instructed the jury that in order to establish guilt on the lesser offense of possession, the government had to prove that Mr. Corrow *knowingly* possessed the feathers. The government did not object to this jury instruction. The jury decided that Mr. Corrow was guilty of illegal possession. After viewing the evidence in the light most favorable to the prosecution, I conclude that a rational jury could find, beyond a reasonable doubt, that Mr. Corrow knowingly possessed feathers of birds protected by the Migratory Bird Treaty Act. Mr. Corrow's motion for judgment of acquittal on Count II should be denied.

### V. Mr. Corrow's Objection to Presentence Report:

■ On July 2, 1996, I sentenced Mr. Corrow, under 18 U.S.C. § 3553(b), to probation for a period of five years as to each count and ordered that the sentences run concurrently. Before his sentencing, Mr. Corrow had filed objections to the Presentence Re-

port, which included an objection to the total offense level calculation by the probation officer under United States Sentencing Guideline ("U.S.S.G.") § 2B1.1. After considering the briefs and hearing arguments of counsel, I found under U.S.S.G. § 2X5.1 that there is not a sufficiently analogous guideline in Chapter 2 of the sentencing guidelines and, therefore, that the sentence should be imposed under 18 U.S.C. § 3553(b).

There is no sentencing guideline that specifically applies to a violation of 18 U.S.C. § 1170(b), which prohibits the purchase and sale of Native American "cultural items." When no guideline has been expressly promulgated, the court is to use the most analogous guideline. *United States v. Voss*, 956 F.2d 1007, 1012 (10th Cir.1992); U.S.S.G. § 2X5.1 ("If the offense is a felony or Class A misdemeanor for which no guideline expressly has been promulgated, apply the most analogous offense guideline."). If there is not an analogous guideline, the provisions of 18 U.S.C. § 3553(b) control the determination of the proper sentence to be imposed. *Voss*, 956 F.2d at 1013; U.S.S.G. § 2X5.1.

18 U.S.C. § 3553(b) states that "[i]n the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)2." Subsection (a)(2) requires the sentencing court to consider:

> the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

The probation officer concluded that the most analogous statute applicable to these

---

known that the Migratory Bird Treaty Act prohibited the possession of those feathers.

**17.** In 1986, Congress amended the statute by adding a scienter requirement to that part of the statute dealing with the purchase or sale of feath-

ers protected by the Migratory Bird Treaty Act. 16 U.S.C. § 707(b). However, this amendment did not affect section 707(a) which makes the unlawful possession of feathers a misdemeanor offense.

facts was the Antiquities Act, 16 U.S.C. § 433, which prohibits the appropriating, excavating, injuring, or destroying of any historic or prehistoric ruin, monument or object of antiquity, situated on federal lands. The Sentencing Guidelines Manual specifies that sentencing guidelines 2B1.1 and 2B1.3 ordinarily are applicable to violations of 16 U.S.C. § 433. Appendix A—Statutory Index at p. 374. U.S.S.G. § 2B1.1 concerns offenses involving "theft, embezzlement, receipt of stolen property, and property destruction." U.S.S.G. § 2B1.3 addresses offenses of property damage or destruction.

The primary purpose of NAGPRA, which is to assist Native Americans in the repatriation of items that the tribes consider sacred, differs from that of the Antiquities Act, which is directed against the unlawful taking or destruction of property. Because the intended purposes of the two acts differ significantly, they should not be treated similarly for sentencing calculations.

In addition, I believe that U.S.S.G. §§ 2B1.1 and 2B1.3 should not apply in this case because there was no evidence that Mr. Corrow embezzled or stole the Yei B'Chei or that he damaged the Yei B'Chei. Instead, Mr. Corrow purchased the Yei B'Chei from Mrs. Winnie for $10,000.00 in cash. Furthermore, I did not find persuasive the government's argument that Mr. Corrow's buying the Yei B'Chei for $10,000.00 in cash was similar to an illegal taking. Mr. Corrow's misconduct, as the government claimed in the indictment, was unlawful trafficking. Hence, I concluded that 18 U.S.C. § 3553(b) should govern Mr. Corrow's sentence.

IT IS THEREFORE ORDERED that:

(1) As stated on the record at the motion hearing held April 19, 1996, Mr. Corrow's "Motion to Dismiss Count I" (doc. 7) is DENIED;

(2) Mr. Corrow's "Motion for Judgment of Acquittal, Pursuant to Rule 29(c), after Discharge of Jury and Supporting Authorities" (doc. 47) is DENIED; and

(3) As stated on the record at Mr. Corrow's sentencing on July 2, 1996, Mr. Corrow's objection to the Presentence Report was well taken, and sentencing under 18 U.S.C. § 3553(b) was proper.