# UNITED STATES COURT OF APPEALS
## Tenth Circuit
### Byron White United States Courthouse
### 1823 Stout Street
### Denver, Colorado 80294
### (303) 844-3157

Patrick J.  Fisher, Jr.
Clerk

Elisabeth A. Shumaker
Chief Deputy Clerk

July 16, 1997

**TO:** All recipients of the captioned opinion

**RE:** 96-2185, USA v. Corrow
July 11, 1997

Please be advised of the following correction to the captioned decision:

Due to a typographical error, a word in the opinion is erroneously spelled.  On the first line of page thirteen, "swarths" should be "swathes."  Please make the correction.

Very truly yours,

Patrick Fisher, Clerk

Susie Tidwell
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 11 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

RICHARD NELSON CORROW,

      Defendant-Appellant.

-----------------------------------------------------

ANTIQUE TRIBAL ART DEALERS
ASSOCIATION,

      Amicus Curiae.

No. 96-2185

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CR-95-637-JP)**

---

Joseph Gandert (Alonzo J. Padilla with him on the briefs), Assistant Federal Public Defenders, Albuquerque, New Mexico, for Defendant-Appellant.

Paula Burnett, Assistant U.S. Attorney (John J. Kelly, United States Attorney, with her on the briefs), Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **PORFILIO**, **MCWILLIAMS**, and **LUCERO**, Circuit Judges.

---

**PORFILIO**, Circuit Judge.

---

This appeal raises issues of first impression in this Circuit under the Native American Graves Protection and Repatriation Act, 25 U.S.C. §§ 3001-3013 (NAGPRA); and the Migratory Bird Treaty Act, 16 U.S.C. §§ 701-712 (MBTA). Richard Nelson Corrow challenges the constitutionality of 25 U.S.C. § 3001(3)(D) of NAGPRA which defines "cultural patrimony," the basis for his conviction of trafficking in protected Native American cultural items in violation of 18 U.S.C. § 1170(b). First, he contends the definition is unconstitutionally vague, an argument the district court rejected in denying his motion to dismiss that count of the indictment and to reverse his conviction. *United States v. Corrow*, 941 F. Supp. 1553, 1562 (D.N.M. 1996). Second, he invites us to read a scienter requirement into § 703 of the MBTA to vitiate the government's proof he possessed protected bird feathers. Failing these propositions, he attacks the sufficiency of the evidence supporting his two counts of conviction. We affirm.

## I. Background

Until his death in 1991, Ray Winnie was a *hataali,* a Navajo religious singer. For more than twenty-five years Mr. Winnie chanted the Nightway and other Navajo ceremonies wearing Yei B'Chei originally owned by Hosteen Hataali Walker. Yei

B'Chei or Yei B'Chei *jish* are ceremonial adornments, Native American artifacts whose English label, "masks," fails to connote the Navajo perception these cultural items embody living gods. Traditionally, a *hataali* passes the Yei B'Chei to a family or clan member who has studied the ceremonies or loans the Yei B'Chei to another Navajo clan, Mr. Winnie having acquired his Yei B'Chei from a different clan during his *hataali* apprenticeship. When Mr. Winnie died, he left no provision for the disposition of his Yei B'Chei, and no family or clan member requested them.

Richard Corrow, the owner of Artifacts Display Stands in Scottsdale, Arizona, is an afficionado of Navajo culture and religion, having, on occasion, participated in Navajo religious ceremonies. Some time after Mr. Winnie's death, Mr. Corrow traveled to Lukachukai, Arizona, to visit Mrs. Fannie Winnie, Mr. Winnie's 81-year-old widow, chatting with her; her granddaughter, Rose Bia; and other family members: a great granddaughter, Harriette Keyonnie; and a son-in-law. During one visit, Mrs. Winnie displayed some Navajo screens and robes, and Mr. Corrow inquired about the Yei B'Chei. By his third visit in August 1993, the Winnie family revealed the Yei B'Chei, twenty-two ceremonial masks, and permitted Mr. Corrow to photograph them. Mr. Corrow told Mrs. Winnie he wanted to buy them, suggesting he planned to deliver the Yei B'Chei to a young Navajo chanter in Utah to keep them sacred. Although Mr. Corrow initially offered $5,000, he readily agreed to the family's price of $10,000 for the Yei

B'Chei, five headdresses, and other artifacts. Mr. Corrow drafted a receipt,[1] and Mrs. Winnie, who spoke no English, placed her thumbprint on the document after Ms. Bia read it to her in Navajo.

In November 1994, the owners of the East-West Trading Company in Santa Fe, New Mexico, contacted Mr. Corrow telling him that a wealthy Chicago surgeon was interested in purchasing a set of Yei B'Chei. In fact, the purported buyer was James Tanner, a National Park Service ranger operating undercover on information he had received about questionable trade at East-West. When Agent Tanner visited the business, its owners showed him photographs of seventeen of the twenty-two Yei B'Chei that Mr. Corrow purchased from Mrs. Winnie. In the photos, he noticed eagle and owl feathers in several of the large headdresses and ceremonial sticks bundled with small eagle feathers. After negotiations, Agent Tanner agreed to a purchase price of $70,000 for the Yei B'Chei, $50,000 for Mr. Corrow and a $20,000 commission to East-West's co-owners.

---

[1]The receipt stated:

> Sold to Richard N. Corrow on this date for cash paid in full, all of the medicine bundles for yei be chai [sic] and fire dance including masks owned by Hosteen Ray Winnie of Lukachucki [sic], AZ.
> Selling these medicine bundles or jish is the wife of the late Mr. Winnie, Fanny [sic], and his granddaughter Rose, and his great granddaughter, Harriet, whose signatures are below.
> The selling price is in cash of $10,000. Received by below this date.

On December 9, 1994, Mr. Corrow arrived at the Albuquerque airport en route to Santa Fe carrying one large suitcase, one small suitcase, and a cardboard box. Yet once he was in Santa Fe, F.B.I. agents became worried East-West's owners had been alerted and abandoned their script for the planned buy, instead directly executing the search warrant. Agents found the two suitcases Mr. Corrow had carried to East-West, one holding Navajo religious objects, small bundles, herbs, mini prayer sticks, and other artifacts adorned with eagle feathers. Another suitcase contained eagle feathers rolled inside several cloth bundles, Yei B'Chei dance aprons, and five headdress pieces made of eagle and owl feathers. In the cardboard box was the set of twenty-two Yei B'Chei.

The government subsequently charged Mr. Corrow in a two-count indictment, Count one for trafficking in Native American cultural items in violation of 18 U.S.C. § 1170, 25 U.S.C. §§ 3001(3)(D), 3002(c), and 18 U.S.C. § 2; and Count two for selling Golden Eagle, Great Horned Owl, and Buteoine Hawk feathers protected by the MBTA in violation of 16 U.S.C. § 703, 16 U.S.C. § 707(b)(2), and 18 U.S.C. § 2. The court rejected Mr. Corrow's pretrial motion to dismiss Count one based on its purported unconstitutional vagueness, and the trial proceeded comprised predominantly of the testimony of expert witnesses clashing over whether the Yei B'Chei constitute "cultural patrimony" protected by NAGPRA. Having concluded they do, the jury convicted Mr. Corrow of illegal trafficking in cultural items, Count one, but acquitted him of Count two, selling protected feathers, instead finding him guilty of committing the lesser included

offense, possession of protected feathers.  Post-trial, Mr. Corrow attacked his conviction renewing his challenge to the constitutionality of §§ 3001(3)(D) and 3002(c) of NAGPRA and to the sufficiency of the evidence underlying his conviction.  *Corrow,* 941 F. Supp. at 1553.  The district court denied the motion and sentenced him to two concurrent five-year probationary terms and one hundred hours of community service.

In this renewed challenge, Mr. Corrow asserts the court erred in failing to dismiss Count one on the ground the NAGPRA definition of cultural patrimony is unconstitutionally vague, trapping the unwary in its multitude of meanings and creating easy prey for the untrammeled discretion of law enforcement.[2]  Were NAGPRA's definitional bounds nevertheless discernible, Mr. Corrow then urges the evidence was insufficient to support his conviction on either count.  Mr. Corrow acknowledges our *de novo* review of the legal question he raises, *United States v. Murphy*, 977 F.2d 503, 504 (10th Cir. 1992); and our task of deciding whether substantial evidence, both direct and circumstantial taken together, underpins the conviction to confirm a reasonable jury could find defendant guilty beyond a reasonable doubt.  *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1472 (10th Cir. 1994).

---

[2]Mr. Corrow does not specifically address 25 U.S.C. § 3002(c) which prohibits the intentional removal of Native American cultural items unless done with (1) a permit; (2) after consultation with or consent of the Indian tribe; and (3) proof of tribal consultation or consent.  Our disposition of § 3001(3)(D) subsumes without directly addressing the issue.

## II. NAGPRA

Congress enacted NAGPRA in 1990 to achieve two principle objectives: to protect Native American human remains, funerary objects, sacred objects and objects of cultural patrimony presently on Federal or tribal lands; and to repatriate Native American human remains, associated funerary objects, sacred objects, and objects of cultural patrimony currently held or controlled by Federal agencies and museums. H. R. Rep. No. 101-877, 101st Cong., 2d Sess. 1990, *reprinted in* 1990 U.S.C.C.A.N. 4367, 4368. The legislation and subsequent regulations, 43 C.F.R. §§ 10.1 - 10.17, provide a methodology for identifying objects; determining the rights of lineal descendants, Indian tribes and Native Hawaiian organizations; and retrieving and repatriating that property to Native American owners. NAGPRA's reach in protecting against further desecration of burial sites and restoring countless ancestral remains and cultural and sacred items to their tribal homes warrants its aspirational characterization as "human rights legislation." Jack F. Trope & Walter R. Echo-Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History*, 24 Ariz. St. L.J. 35, 37 (1992). Indeed, a Panel of National Dialogue on Museum-Native American Relations, which was convened to address the divergent interests of the museum and Native American communities, reported to Congress that "[r]espect for Native human rights is the paramount principle that should govern resolution of the issue when a claim is made." 1990 U.S.C.C.A.N. 4369-70.

Nonetheless to give teeth to this statutory mission, 18 U.S.C. § 1170 penalizes trafficking in Native American human remains and cultural items and creates a felony offense for a second or subsequent violation. Subsection 1170(b), the basis for prosecution here, states:

> Whoever knowingly sells, purchases, uses for profit, or transports for sale or profit any Native American cutural items obtained in violation of the Native American Grave Protection and Repatriation Act shall be fined in accordance with this title, imprisoned not more than one year, or both, and in the case of a second or subsequent violation, be fined in accordance with this title, imprisoned not more than 5 years, or both.

One must look to NAGPRA, 25 U.S.C. § 3001, for the definition of "cultural item." Section 3001(3) states:

> "cultural items means human remains and --
> (D) "cultural patrimony" which shall mean an object having ongoing historical, traditional, or cultural importance central to the Native American group or culture itself, rather than property owned by an individual Native American, and which, therefore, cannot be alienated, appropriated, or conveyed by any individual regardless of whether or not the individual is a member of the Indian tribe or Native Hawaiian organization and such object shall have been considered inalienable by such Native American group at the time the object was separated from such group.[3]

---

[3]There are three other components of "cultural items" included in § 3001(3): (A) "associated funerary objects"; (B) "unassociated funerary objects" and (C) "sacred objects." The government alleged the Yei B'Chei are "cultural patrimony" and has not argued they constitute "sacred objects," defined as "specific ceremonial objects which are needed by traditional Native American religious leaders for the practice of traditional Native American religions by their present day adherents." 16 U.S.C. § 3001(3)(C).

- 8 -

Thus, to be judged "cultural patrimony"[4] the object must have (1) ongoing historical, cultural or traditional importance; and (2) be considered inalienable by the tribe by virtue of the object's centrality in tribal culture. That is, the cultural item's essential function within the life and history of the tribe engenders its inalienability such that the property cannot constitute the personal property of an individual tribal member. "The key aspect of this definition is whether the property was of such central importance to the tribe or group that it was owned communally." Francis P. McManamon & Larry V. Nordby, *Implementing the Native American Graves Protection and Repatriation Act*, 24 Ariz. St. L.J. 217, 233-34 (1992). The regulations mirror this definition and incorporate the Senate Report for its version of the bill which did not pass, S. Rep. No. 473, 101st Cong., 2d Sess. 1 (1990). 43 C.F.R. § 10.2(d)(4).[5]

---

[4]Webster's Third New International Dictionary defines "patrimony" as "anything derived from one's father or ancestors: HERITAGE; an inheritance from the past; an estate or property held by ancient right."

[5]43 C.F.R. § 10.2(d)(4) states:

> *Objects of cultural patrimony* means items having ongoing historical, traditional, or cultural importance central to the Indian tribe or Native Hawaiian organization itself, rather than property owned by an individual tribal or organization member. These objects are of such central importance that they may not be alienated, appropriated, or conveyed by any individual tribal or organization member. Such objects must have been considered inalienable by the culturally affiliated Indian tribe or Native Hawaiian organization at the time the object was separated from the group. Objects of cultural patrimony include items such as Zuni War Gods, the Confederacy Wampum Belts of the Iroquois, and other objects of similar character and significance to the Indian tribe or Native Hawaiian

(continued...)

In this prosecution, then, the definition of cultural patrimony divided into its three component parts required the government prove Mr. Corrow trafficked in an object that (1) was not owned by an individual Native American; (2) that could not be alienated, appropriated, or conveyed by an individual; and (3) had an ongoing historical, traditional, or cultural importance central to the Native American group. Mr. Corrow contends the first and second elements are unintelligible.[6] Thus, he argues, relying upon **United States v. Agnew**, 931 F.2d 1397, 1403 (10th Cir. 1991), the definition does not comport with the due process clause of the Fourteenth Amendment because it fails to give ordinary people fair notice about what conduct is prohibited in such a manner that discourages arbitrary and discriminatory law enforcement.

In support, Mr. Corrow arrays the conflicting expert testimony, characterized by the *amicus curiae*[7] as a conflict between orthodox and moderate Navajo religious views. For the government, Alfred Yazzie, an ordained *hataali* and Navajo Nation Historic Preservation representative, testified the Yei B'Chei must remain within the four sacred

---

[5](...continued)
organization as a whole.

[6]Before the district court, Mr. Corrow challenged the third element as well contending there was nothing unique about these Yei B'Chei. On appeal, he targets only the question of alienability.

[7]The Antique Tribal Art Dealers Association, a trade organization promoting authenticity and ethical dealing in the sale of Native American artifacts, filed an amicus brief contending the government in this case "exploited a controversy between orthodox and moderate Navajo religious perspectives."

mountains of the Navajo for they represented the "heartbeat" of the Navajo people.[8]  Also

for the government, Harry Walters, a Navajo anthropologist, stated there is "no such thing

as ownership of medicine bundles and that these are viewed as living entities."  He

equated ownership with use, knowing the rituals, but acknowledged often cultural items

are sold because of economic pressures.  For Mr. Corrow, Jackson Gillis, a medicine man

from Monument Valley, testified that if no claim is made by a clan relative or other

singer, the *jish* pass to the widow who must care for them.  If the widow feels

uncomfortable keeping the *jish*, Mr. Gillis stated she has the right to sell them.  Harrison

Begay, another of Mr. Corrow's expert witnesses, agreed, explaining that because the

masks themselves are "alive," a widow, uneasy about their remaining unused, may sell

them.  Billy Yellow, another *hataali* testifying for Mr. Corrow, reiterated the traditional

disposition of a *hataali*'s Yei B'Chei to a spouse, the children, and grandchildren,

although he stated nobody really owns the *jish* because they are living gods.

Given these conflicting views on the alienability of the Yei B'Chei, Mr. Corrow

asks how an individual, even one educated in Navajo culture, indeed, one accepting the

---

[8]He stated, "This is my heartbeat, this is my life, this is my teaching.  This causes me to behave right.  It allows me to teach my children to behave.  So it's a God-given gift to the Navajos and it has everything to do with the welfare and the health and wisdom." He explained the *hataali* is responsible for caring for the *jish*, restoring them in the event of exposure to the wrong people or places: "when they do come back we would have to use what we call a diagnosis to see what can be done and how we can treat them and bring them back to the respect that they should have."  He explained the Navajo tradition of compensating a person who gives his Yei B'Chei to another chanter.

responsibility of inquiring further about the status of the item as the district court deduced from its reading of NAGPRA, can "ascertain ownership when the group itself cannot agree on that point?"  The shadow cast by this question, he insists, sufficiently clouds the meaning of "cultural patrimony" to render it unconstitutional.  Mr. Corrow's invocation of void-for-vagueness review, however, obfuscates both its doctrinal reach and its application to the facts of this case.

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  Although *Kolender* acknowledged a judicial shift from concern over deciding whether the statute provides actual notice to "the more important aspect of the vagueness doctrine ... the requirement that a legislature establish minimal guidelines to govern law enforcement," *id*. at 358, the legality principle, no crime or punishment without law, is the essence of a Fifth Amendment due process challenge.  *See* 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 3.1, at 271 (1986).  That is, given the limitations of language and syntax, a statute must convey to those individuals within its purview what it purports to prohibit and how it will punish an infraction.  While the Court equates that requirement roughly with a

notion of "fairness," it swarths it with the constitutional guarantees of the Fifth Amendment.[9]

A couple of applications of these principles are instructive to our review. In *Palmer v. City of Euclid*, 402 U.S. 544 (1971), the Court held a suspicious person municipal ordinance was "so vague and lacking in ascertainable standards of guilt that, as applied to Palmer, it failed to give 'a person of ordinary intelligence fair notice that his contemplated conduct is forbidden.'" *Id.* at 545 (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)). The city ordinance defined a "suspicious person" as one wandering about the streets at late or unusual hours without visible or lawful business and a satisfactory explanation for his presence. The police had charged James Palmer with violating this ordinance after he had dropped a woman off late at night and then pulled onto the street, parked with his headlights on, and used a two-way radio. Mr. Palmer's imprecise explanation for his behavior coupled with the conduct itself, the police decided, violated the ordinance. The Court held, however, "in our view the ordinance gave insufficient notice to the average person that discharging a friend at an apartment house and then talking on a car radio while parked on the street was enough to show him to be 'without any visible or lawful business.'" *Id.* at 546.

---

[9]When a federal statute is involved, the due process clause of the Fifth Amendment is implicated. However, a void-for-vagueness challenge to a state statute involves the Fourteenth Amendment's due process clause.

In **Kolender**, the Court invalidated a California criminal statute which required persons loitering or wandering on the streets to provide "credible and reliable" identification. 461 U.S. at 353. Because the statute failed to describe with sufficient particularity "what a suspect must do to satisfy the statute," that is, what constitutes "credible and reliable" identification, the Court found it unconstitutional on its face "because it encourages arbitrary enforcement." **Id.** at 361. Hence, while **Kolender's** focus is the potential for unrestrained police discretion, that concern remains rooted in the Court's predicate finding the statutory requirement of "credible and reliable" identification is unfair. In void-for-vagueness review "[t]he same facets of a statute usually raise concerns of both fair notice and adequate enforcement standards." **United States v. Gaudreau**, 860 F.2d 357, 359 (10th Cir. 1988). Consequently, under **Kolender's** guidance, we "treat each as an element to be analyzed separately." **Id.** at 359-60.[10]

However, the Court has made equally clear our analysis is not global. "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." **United States v. Mazurie**, 419 U.S. 544, 550 (1975). Thus, to succeed, the proponent "who engages in some conduct that is clearly proscribed [by the challenged statute] cannot complain of the vagueness of the law as applied to the conduct of others." **Village of Hoffman Estates v.**

---

[10]**Gaudreau** delineates the differences in void-for-vagueness review when a criminal rather than a civil statute is involved. **United States v. Gaudreau**, 860 F.2d 357, 360 (10th Cir. 1988).

*Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982); *United States v. Austin*, 902 F.2d 743, 745 (9th Cir. 1990). Further, in a facial challenge raising no First Amendment or other claim that the act reaches constitutionally protected conduct, the complainant "must demonstrate that the law is impermissibly vague in *all* of its applications." *Id.* at 497 (emphasis added).

Mr. Corrow cannot meet that burden. First, deciding whether the statute gave him fair notice, the district court found, after reviewing all of the expert testimony, Mr. Corrow is knowledgeable about Navajo traditions and culture and "would have been aware that various tribal members viewed ownership of property differently." 941 F. Supp. at 1560. The court cited the testimony of Ms. Charlotte Frisbie, author of *Navajo Medicine Bundles or Jish: Acquisition, Transmission and Disposition in the Past and Present* (1987). Ms. Frisbie related several calls from Mr. Corrow inquiring about the prices of certain Navajo artifacts. *Id.* at 1562 n.13. Although she stated he did not specifically ask her about these Yei B'Chei, she expressed her objection to dealers and commercial handlers selling Native American cultural objects in the open market. *Id.* Ms. Frisbie also reminded him both of the Navajo Nation's implementing procedures to return cultural items and of the enactment of NAGPRA. *Id.* Most damning, Ms. Bia, Mrs. Winnie's granddaughter, recounted Mr. Corrow's representation that he wanted to buy the Yei B'Chei to pass on to another young chanter in Utah. Reasonably, a jury could infer from that representation that Mr. Corrow appreciated some dimension of the Yei

B'Chei's inherent inalienability in Navajo culture. Although Mrs. Winnie stated she believed the Yei B'Chei belonged to her, she testified, "[t]here was another man that knew the ways and he had asked of [the Yei B'Chei] but I was the one that was stalling and ended up selling it." *Id.* at 1565. Although this man trained with her husband, he had not offered her any money. This is not a case of an unsuspecting tourist happening upon Mrs. Winnie's hogan and innocently purchasing the set of Yei B'Chei. Nor is it even close to *Palmer* or *Kolender* where the unwary had no means or ability to discern their conduct violated the acts in question.

Surely, this evidence establishes Mr. Corrow had some notice the Yei B'Chei he purchased were powerfully connected to Navajo religion and culture. While it may be true that even the experts in that culture differed in their views on alienability, *no* expert testified it was acceptable to sell Yei B'Chei to non-Navajos who planned to resell them for a profit, the very conduct § 1170(b) penalizes. All experts testified the Yei B'Chei resided within the Four Corners of the Navajo people and acknowledged the ritual cleansing and restoration required were the Yei B'Chei to be defiled in any way. Thus, while the parameters of the designation "cultural patrimony" might be unclear in some of its applications and at its edges, there is no doubt, in this case as applied to Mr. Corrow, the Yei B'Chei were cultural items which could not be purchased for a quick $40,000 turn of profit. Indeed, the Court observed in *Hoffman Estates*, 455 U.S. at 494 n.6, that "ambiguous meanings cause citizens to 'steer far wider of the unlawful zone' ... than if

the boundaries of the forbidden areas were clearly marked.'" ***Baggett v. Bullitt***, 377 U.S. 360, 372 (1964) (quoting ***Speiser v. Randall***, 357 U.S. 513, 526 (1958)) (internal quotation marks omitted). Consequently, even if the term cultural patrimony "might reflect some uncertainty as applied to extreme situations, the conduct for which [defendant] was prosecuted and convicted falls squarely within the core of the [Act]." ***United States v. Amer***, 110 F. 3d 873, 878 (2d Cir. 1997) (challenge to International Parental Kidnapping Crime Act attacking such terms as "lawful exercise of parental rights" as unconstitutionally vague failed where defendant's retention of three children in Egypt when at least two of the children were born in New York and other child had stayed in New York for eight years was clearly proscribed by IPKCA).

Consequently, we believe Mr. Corrow had fair notice - if not of the precise words of NAGPRA - of their meaning that Native American objects "having ongoing historical, traditional, or cultural importance central to the Native American group ... rather than property owned by an individual Native American" could not be bought and sold absent criminal consequences. Moreover, contrary to Mr. Corrow's assertion, § 3001(3)(D) is not infirm because it fails to list examples of cultural items. "In short, due process does not require that citizens be provided actual notice of all criminal rules and their meanings. The Constitution is satisfied if the necessary information is reasonably obtainable by the public." ***United States v. Vasarajs***, 908 F.2d 443, 449 (9th Cir. 1990) (citations to La Fave & Scot omitted) (statute barring reentry onto military base was not

unconstitutionally vague because it failed to inform individuals of the precise boundaries of the base).

While not dispositive, we would add § 1170(b) includes scienter as an element of the offense ("Whoever knowingly sells, purchases, uses for profit...."). "A statutory requirement that an act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware." *Screws v. United States*, 325 U.S. 91, 101-02 (1945) (Douglas, J., concurring). Here, the government was required to prove Mr. Corrow knowingly used the Yei B'Chei for profit assuring his understanding of the prohibited zone of conduct.[11] "[A] scienter requirement may mitigate a criminal law's vagueness by

---

[11]We do not say that a scienter requirement alone will rescue an otherwise vague statute, recognizing "it is possible willfully to bring about certain results and yet be without fair warning that such conduct is proscribed." 1 W. LaFave & A. Scott, Jr., *Substantive Criminal Law* § 2.3, at 131 (1986). We would add in Sherry Hutt, *Illegal Trafficking in Native American Human Remains and Cultural Items: A New Protection Tool,* 24 Ariz. St. L.J. 135, 146 (1992), the author states as a general-intent crime, "the prosecution must prove that the defendant knew he was engaging in a financial activity, but need not prove that the defendant knew that the item was protected. One who deals in Native American cultural items does so at the risk that an item may be protected by NAGPRA. Failure to realize an intended profit is not a defense to a section 4 violation. If the defendant bought, sold, used for profit, or transported for intended sale or profit a protected item, the law is violated, regardless of the actual beneficial outcome of the transaction." The discussion, of course, presumes the constitutionality of NAGPRA and its penalty provision.

ensuring that it punishes only those who are aware their conduct is unlawful." *Gaudreau*, 860 F.2d at 360.

Our analysis of the fairness issue infuses our disposition of the second vagueness concern, the potential for arbitrary and discriminatory enforcement. Unlike the police in *Kolender* who had complete discretion to judge what "reliable and credible" identification might be, in this case, as the district court found, the statute as applied caused law enforcement officers to inquire of tribal officials to determine whether the cultural item in question constituted cultural patrimony. 941 F. Supp. at 1564. Here, the Department of the Interior National Park Service officer, Mr. Young, examined a photograph of the Yei B'Chei and discussed their significance with other knowledgeable Park Service officers and representatives of the Navajo Nation before deciding the items constituted cultural patrimony. Mr. Young testified he participated in other NAGPRA investigations and was aware that law enforcement officers must first consult with tribal representatives to determine whether an item has ongoing historical, cultural, or traditional importance. We conclude, therefore, as applied to Mr. Corrow, § 1170(b) provides sufficient guidance to law enforcement to dispel the fear of subjective

enforcement.[12]  We affirm the district court's denial of Mr. Corrow's motion to dismiss Count one.

Having failed in his constitutional challenge, Mr. Corrow urges we examine the same evidence which defeated the legal claim to support his contention the government failed to prove Mrs. Winnie was not the rightful owner of the Yei B'Chei.  The evidence we detailed *infra* - the expert and family members' testimony as well as that of Forest Service agents - viewed in the government's favor satisfies us that a rational jury could find beyond a reasonable doubt the Yei B'Chei are cultural patrimony which Mr. Corrow could not resell for profit.  We therefore affirm the district court's denial of the motion for judgment of acquittal on Count one.

---

[12]We would note there have been similar challenges to federal statutes protecting items deemed antiquities under the Antiquities Act of 1906, 16 U.S.C. § 431 - 433 (1988), and the Archeological Resources Protection Act (ARPA), 16 U.S.C. §§ 470aa-470mm. Although the Ninth Circuit invalidated the Antiquities Act, sustaining a challenge to its penalizing appropriating "objects of antiquity situated on lands owned and controlled by the Government of the United States," as applied to taking three or four year old face masks from a cave, **United States v. Diaz**, 499 F.2d 113 (9th Cir. 1974), we upheld the same act in **United States v. Smyer**, 596 F.2d 939 (10th Cir. 1979), where defendants excavated a prehistoric Mimbres ruin at an archeological site, removing objects of antiquity.  We held in light of defendants' conduct, the Antiquities Act was not unconstitutionally vague.  Later, the Ninth Circuit upheld the Antiquities' Act's successor, ARPA, in **United States v. Austin**, 902 F.2d 743 (9th Cir. 1990).  Defendant there unsuccessfully argued the terms, "weapons" and "tools" were unconstitutionally vague, the court's having found regarding defendant "there can be no doubt nor lack of fair notice that the scrapers and arrow points for which he was convicted are indeed weapons and tools."  **Id.**  at 745.  These predecessors were instructive to the district court's analysis.

## III. MBTA

Under 16 U.S.C. § 703, it is

> unlawful at any time, by any means or in any manner to ... possess, offer for sale, sell ... any migratory bird, any part ... or any product, which consists, or is composed in whole or in part, of any such bird or any part ... included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds ....

Since its enactment, the majority of courts considering misdemeanor violations under § 703 of the MBTA have treated these offenses as strict liability crimes, eliminating proof of scienter from the government's case. *United States v. Boynton*, 63 F.3d 337, 343 (4th Cir. 1995). Although we have not previously so held, we now join those Circuits which hold misdemeanor violations under § 703 are strict liability crimes. *See United States v. Smith,* 29 F.3d 270, 273 (7th Cir. 1994); *United States v. Engler*, 806 F.2d 425, 431 (3d Cir. 1986), *cert. denied*, 481 U.S. 1019 (1987); *United States v. Chandler*, 753 F.2d 360, 363 (4th Cir. 1985); *United States v. Catlett,* 747 F.2d 1102, 1105 (6th Cir. 1984); *United States v. Wood,* 437 F.2d 91 (9th Cir. 1971); *Rogers v. United States*, 367 F.2d 998, 1001 (8th Cir. 1966), *cert. denied*, 386 U.S. 943 (1967); *contra*, *United States v. Delahoussaye*, 573 F.2d 910, 913 (5th Cir. 1978). Simply stated, then, "it is not necessary to prove that a defendant violated the Migratory Bird Treaty Act with specific intent or guilty knowledge." *United States v. Manning*, 787 F.2d 431, 435 n.4 (8th Cir. 1986).

Nonetheless, Mr. Corrow invites us to read a scienter requirement into the MBTA to satisfy the due process concerns implicit in all criminal statutes. However, the plain language of § 703 renders simple possession of protected feathers unlawful ("it shall be unlawful"). Like other regulatory acts where the penalties are small and there is "no grave harm to an offender's reputation," *Engler*, 806 F.2d at 531, conduct alone is sufficient.[13]

Here, in fact, the district court instructed the jury it must find Mr. Corrow knowingly possessed Golden Eagle and Great-Horned Owl feathers. In rejecting his motion for judgment of acquittal on Count two, the district court pointed to the photographs of the Yei B'Chei Mr. Corrow gave to East-West, the feathers found in his suitcase, and testimony of an F.B.I. agent indicating Mr. Corrow's awareness of the illegal trade in protected feathers. Under our announced position, this evidence abundantly satisfied § 703. We therefore affirm the district court's denial of the motion for judgment of acquittal and hold the evidence was sufficient to permit a rational jury to find Mr. Corrow possessed protected bird feathers whether he did so knowingly or not.

We therefore **AFFIRM** the judgment of the district court.

---

[13]We would note, in 1986, Congress amended § 707(b) of the MBTA inserting the word "knowingly" to the offense of selling migratory birds. In a recent opinion, the First Circuit held that "knowingly" in § 707(b) required the government to prove a knowing act but not a wilful act based on its reading of the entire context of the MBTA. *United States v. Pitrone,* ___ F.3d. ___, 1997 WL259714 (1st Cir. Mass. 1997). The jury here acquitted Mr. Corrow of violation of § 707(b).