**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 30, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

APOLLO ENERGIES, INC.,

Defendant-Appellant.

and*

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DALE WALKER, doing business as
RED CEDAR OIL,

Defendant-Appellant.

No. 09-3037

No. 09-3038

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 6:08-CR-10111-01-JTM and**
**D.C. NO. 6:08-CR-10112-01-JTM)**

---

Stephen E. Robison (Daniel E. Lawrence with him on each brief) Fleeson,
Gooing, Coulson & Kitch, L.L.C., Wichita, Kansas for Appellants.

---

\* By the court's Order dated October 29, 2009, these two cases are
consolidated.

Alan G. Metzger, Assistant United States Attorney (Lanny D. Welch, United States Attorney, with him on each brief), Office of the United States Attorney, Wichita, Kansas for Appellee.

Before **HENRY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

"This would have remained a profoundly insignificant case to all except its immediate parties had it not been so tried . . . as to raise questions both fundamental and far-reaching in federal criminal law . . . ." *Morissette v. United States*, 342 U.S. 246, 257 (1952). And we might add, "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzatta v. New Jersey*, 306 U.S. 451, 453 (1939).

This case requires us to consider the scope of the Migratory Bird Treaty Act (MBTA or Act). The Act declares it a misdemeanor to "pursue, hunt, take, capture, [or] kill" birds protected by several international treaties. 16 U.S.C. § 703. The MBTA also specifies a maximum penalty of $15,000 and six months in prison for a misdemeanor violation, but does not require any particular mental state or mens rea to violate the statute. *See* 16 U.S.C. § 707(a). The question this case presents is whether the MBTA constitutionally can make it a crime to violate its provisions absent knowledge or the intent to do so.

Appellants are two Kansas oil drilling operators who were charged with violating the Act after dead migratory birds were discovered lodged in a piece of their oil drilling equipment called a heater-treater. After a trial before a magistrate judge, both Apollo Energies and Dale Walker (doing business as Red Cedar Oil) were convicted of taking or possessing migratory birds, each misdemeanor violations. Apollo was fined $1,500 for one violation, and Walker was fined $250 for each of his two violations. The federal district court affirmed the convictions, concluding that violations of § 703 of the MBTA are strict liability offenses, which do not require that defendants knowingly or intentionally violate the law.

On appeal, Apollo and Walker renew their challenges to the MBTA, claiming (1) it is not a strict liability crime to take or possess a protected bird, or, (2) if it is a strict liability crime, the Act is unconstitutional as applied to their conduct. We conclude the district court correctly held that violations of the MBTA are strict liability crimes. But we hold that a strict liability interpretation of the MBTA for the conduct charged here satisfies due process only if defendants proximately caused the harm to protected birds. After carefully examining the trial record, we agree Apollo proximately caused the taking of protected birds, but with respect to one of his two convictions, Walker did not. Due process requires criminal defendants have adequate notice that their conduct is a violation of the Act.

Consequently, exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM in part and REVERSE in part the district court's decision.

## I. Background

Apollo and Walker own many heater-treaters, a device commonly used in oil drilling operations. Heater-treaters are cylindrical equipment up to 20 feet high and more than three feet wide that separate oil from water when the mixture is pumped from the ground. The heater-treaters at issue in this case have vertical exhaust pipes that are approximately nine inches in diameter, and Walker's heater-treaters included movable louvers that can be opened to access heating equipment at the base. Birds can crawl into the exhaust pipes or through the louvers to form nests. Once inside the heater-treaters, escape can be difficult for some birds.

Acting on an anonymous tip, an agent with the U.S. Fish and Wildlife Service (Fish and Wildlife, or Service) inspected more than a dozen of Apollo's heater-treaters in December 2005. He found bird remains in about half of the heater-treaters he inspected. In February 2006, Fish and Wildlife officers expanded their investigation in the region (southeast Kansas), finding more than 300 dead birds in heater-treaters, 10 of which were identified as protected species under the MBTA.[1]

---

[1] According to a government witness at trial, the issue of bird deaths in heater-treaters was "brand new to the Service," and to his knowledge, no Fish and
(continued...)

As a result of the investigation, Fish and Wildlife embarked on a public education campaign to alert oil producers to the heater-treater problem. The Service sent letters to 36 of the oil companies involved in the February 2006 inspections, including Apollo. The record does not disclose, however, that Walker's company, Red Cedar, received the notice. Fish and Wildlife also created a poster describing the problem, which it distributed to oil equipment supply companies. Service representatives made presentations to the Kansas Independent Oil and Gas Association and at a Kansas Corporation Commission Oil and Gas meeting. Finally, a Kansas television station and the Associated Press news service each ran a story about heater-treaters' threat to protected birds. Fish and Wildlife chose not to recommend prosecution for MBTA violations related to heater-treaters through the end of 2006, while the education campaign was ongoing.[2]

[1](...continued) Wildlife officer had ever inspected heater-treaters before the December 2005 inspection. Aplt. App. at 116

[2] The education campaign apparently reached Apollo but not Walker. Apollo had notice of the heater-treater problem from the time of Fish and Wildlife's inspection of its property in December 2005, and the company's president acknowledged he received the Service's 2006 letter. Walker, however, received no such notice. The Fish and Wildlife agent in charge of the investigation admitted he did not send Walker the Service's 2006 letter, and Walker testified he did not receive a Service letter until June 2007—after Fish and Wildlife searched his heater-treater for the first time. It is Walker's undisputed testimony that up to the time of Fish and Wildlife's first search of his property—in April 2007—he did not "know anything" about the heater-treater

(continued...)

In April 2007, after Fish and Wildlife's grace period ended, agents searched heater-treaters belonging to Apollo and Walker. The search of Apollo's heater-treaters yielded the carcass of a Northern Flicker, an MBTA-protected species. Agents found four protected birds in Walker's heater-treaters, as well. When confronted with the dead birds, Walker is reported to have said "that's not good." Aplt. App. 212. A year later, in April 2008, the Service again conducted a search of Walker's heater-treaters. Although Walker had placed metal caps on the exhaust pipes—where birds previously had been found—a Fish and Wildlife agent retrieved a protected bird that he found lodged in a heater-treater's louvers.

Apollo was convicted of one violation of the MBTA based on the April 2007 bird death. Walker also was convicted of two violations based on the April 2007 and April 2008 deaths.

## II. Discussion

Appellants make one statutory and several due process arguments. Their statutory argument is that the MBTA does not create a strict liability crime to take or possess migratory birds, and, under that statutory construction, they lacked the necessary imputed mental state to commit an MBTA violation. Our precedent forecloses Appellants' statutory construction, and consequently we are obliged to address Appellants' broader arguments about the MBTA's constitutionality.

---

[2](...continued)
problem. *See* Aplt. App. 203–5, 282–84.

As to their constitutional due process claims, Appellants argue: (1) the MBTA is unconstitutionally vague because it provides inadequate notice of what conduct is criminal, (2) due process requires that they caused an MBTA violation to be guilty of a crime, and (3) the district court erred in applying the law to the facts in this case.

## A.  Standard of Review

"In an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo."  *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1274 (10th Cir. 2001).  "A finding of fact is not clearly erroneous unless it is without factual support in the record, or unless the court after reviewing all the evidence, is left with a definite and firm conviction that the district court erred."  *United States v. Jarvison*, 409 F.3d 1221, 1224 (10th Cir. 2005) (internal punctuation omitted).

## B.  Statutory Construction: The MBTA Creates a Strict Liability Crime

Appellants first contend § 703 is not a strict liability offense, but contains a scienter requirement.

Section 703 makes it a crime to "take" protected birds:

[I]t shall be *unlawful at any time, by any means or in any manner, to . . . take [or] . . . attempt to take . . . any migratory bird*, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, included in the terms of [various treaties between the United States and Great Britain, Mexico, Japan, and the U.S.S.R.].  (Emphasis added).

16 U.S.C. § 703. Regulations implementing the statute explain that the term

"take" means to "pursue, hunt, shoot, wound, kill, trap, capture, or collect." 50

C.F.R. § 10.12.[3] Under § 707(a), "any person, association, partnership, or

corporation" is "guilty of a misdemeanor" if they "violate any provisions" of the

Act. The statute does not supply a mens rea requirement.

Appellants' contention is foreclosed by our holding in *United States v.*

*Corrow*, 119 F.3d 796 (10th Cir. 1997), which squarely addressed § 703's mens

rea requirement. In *Corrow*, we considered and resolved the mens rea

requirement of § 707(a), and concluded that "misdemeanor violations under § 703

are strict liability crimes." *Id.* at 805. In that case, the defendant was charged

---

[3] The Supreme Court in *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995), determined the reasonableness of federal regulations defining "take," which were similar but not identical to the regulatory definition here. In *Sweet Home*, "take" in the Endangered Species Act (ESA) was defined *by statute* as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect . . . ." *Id.* at 691 (quoting 16 U.S.C. § 1532(19)). The *regulatory* definition of "take" here is the same as the ESA's *statutory* definition except that the regulatory definition omits to "harass" and "harm." *See* 50 C.F.R. § 10.12. *Sweet Home* turned not on the statutory definition of "take," but on the Department of Interior's regulatory interpretation of the word "harm"—again, not a word present in the definition at issue here. The regulatory definition of "harm" encompassed "an act which actually kills or injures wildlife," including "significant habitat modification or degradation." *Sweet Home*, 515 U.S. at 691. The respondents in *Sweet Home*, parties "dependent on the forest products industries," argued that "harm" in the ESA could not include acts such as habitat modification that lead to the harming of protected species. *Id.* at 692. The Court upheld the regulation's broader definition of "harm." Although that word is not present here, and therefore *Sweet Home* does not have much relevance to the current case, inasmuch as the Court upheld a definition of "take" that encompasses acts that lead to the taking of protected species, *Sweet Home* comports with our holding.

with illegal possession of protected Golden Eagle and Great-Horned Owl feathers. We upheld the conviction, finding it persuasive that a plain reading of § 703's text—"it shall be unlawful" to possess protected birds—did not require any particular state of mind or scienter. *Id.* We relied on the fact that "[l]ike other regulatory acts where the penalties are small and there is 'no grave harm to an offender's reputation,'" the Supreme Court has long recognized a different standard applies to those federal criminal statutes that are essentially regulatory. *Id.* (citing *United States v. Engler*, 806 F.2d 425, 432 (3d Cir. 1986) (relying on *Morissette v. United States*, 342 U.S. 246 (1952)). *"Simply stated, then, 'it is not necessary to prove that a defendant violated the Migratory Bird Treaty Act with specific intent or guilty knowledge.'"* *Id.* at 805 (quoting *United States v. Manning*, 787 F.2d 431, 435 n.4 (8th Cir. 1986) (emphasis added).

Our holding in *Corrow* fell in line with those of other circuits at the time of that case. At least seven other circuits either had held that MBTA misdemeanors are strict liability crimes or noted the MBTA's lack of mens rea in passing. *See, e.g.*, *United States v. Pitrone*, 115 F.3d 1, 5 (1st Cir. 1997); *United States v. Hogan*, 89 F.3d 403, 404 (7th Cir. 1996); *United States v. Boynton*, 63 F.3d 337, 343 (4th Cir. 1995); *United States v. Engler*, 806 F.2d 425, 431 (3d Cir. 1986); *United States v. Catlett*, 747 F.2d 1102, 1105 (6th Cir. 1984) (per curiam); *United States v. FMC Corp.*, 572 F.2d 902, 907–08 (2d Cir. 1978); *Rogers v. United States*, 367 F.2d 998, 1001 (8th Cir. 1966). *See also United States v. Morgan*,

311 F.3d 611, 614–16 (5th Cir. 2002) (citing *Corrow* and holding misdemeanor MBTA violations are strict liability crimes). *But see Newton County Wildlife Ass'n*, 113 F.3d 110, 115 (8th Cir. 1997) ("Strict liability may be appropriate when dealing with hunters and poachers. But it would stretch this 1918 statute far beyond the bounds of reason to construe it as an absolute criminal prohibition on conduct, such as timber harvesting, that indirectly results in the death of migratory birds."); *Mahler v. U.S. Forest Serv.*, 927 F. Supp. 1559, 1579 (S.D. Ind. 1996) (questioning the MBTA's application to bird deaths caused indirectly by logging).

Despite this applicable precedent, Appellants challenge the extension of *Corrow* to the conduct alleged here. They reason our holding in *Corrow* was limited to the MBTA violations at issue there—*possessing* and *selling* protected bird feathers. For support, they point to Fish and Wildlife's regulations that define "possession" as "detention and control," and "to take" as to "capture, or collect." 50 C.F.R. § 10.12. They say the linguistic differences imply an active state of mind to violate the Act, and the conduct here was *passive*—they merely failed to bird-proof the heater-treaters.

We see no express or implied limitation to our holding in *Corrow*. In fact, that decision broadly held "misdemeanor *violations* under § 703 are strict liability crimes." *Corrow*, 119 F.3d at 805 (emphasis added). Nothing in the structure or logic of the opinion lends itself to carving out an exception for different types of

-10-

conduct, and therefore a scienter requirement for the takings here.  Nor is there any reason to find that capturing or collecting birds implies a higher mens rea than detaining or controlling them.  *See also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 444 (2002) (defining "collect" as "to regain control of"—similar to the regulations' definition of "possession").  In short, the conduct alleged here has the same mental state requirement as the sale and possession of protected birds we considered in *Corrow*.

Appellants also point to Supreme Court case law on the books at the time we decided *Corrow* as fatally undermining its holding.  They contend three years before *Corrow*, the Supreme Court in *Staples v. United States*, 511 U.S. 600 (1994), cast doubt on the presumption of strict liability when a statute omits a mens rea requirement.  *Id.* at 607–10.  The Court in *Staples* held that strict liability crimes "generally are disfavored," and suggested some indicia of congressional intent, "express or implied," is necessary before courts can dispense with the traditional mens rea requirement.  *Id.* at 606.

While we did not cite to *Staples* in *Corrow*, our reasoning was that although the MBTA was silent as to mens rea, its "plain language"—an indicia of legislative intent—supported a strict liability interpretation.  Congress, moreover, in 1986 added the word "knowingly" to create the felony offense of *selling* migratory birds, while leaving intact the language of the misdemeanor provision without an explicit mens rea requirement.  This is further evidence the legislative

-11-

scheme invokes a lesser mental state for misdemeanor violations. *See* S. REP. NO. 99-445, at 15 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6113, 6128 ("Nothing in this amendment [to create the MBTA felony offense] is intended to alter the 'strict liability' standard for misdemeanor prosecutions under 16 U.S.C. 707(a), a standard which has been upheld in many Federal court decisions."). Finally, the Court in *Staples* took pains to reaffirm the basic proposition that "public welfare" or "regulatory" offenses can "impose a form of strict criminal liability." *Staples*, 511 U.S. at 606.

Appellants also point to cases outside our circuit to argue that *Corrow*'s logic does not apply to the facts here. In particular, they cite *Newton County Wildlife Ass'n v. U.S. Forest Service*, 113 F.3d 110 (8th Cir. 1997), to suggest § 703 does not apply to activities beyond purposeful hunting or possession of migratory birds. *See also Citizens Interested in Bull Run, Inc. v. Edrington*, 781 F. Supp. 1502 (D. Or. 1991); *United States v. Rollins*, 706 F. Supp. 742 (D. Idaho 1989). But all of those cases involved logging or pesticide application that modified bird habitat in some way. While the MBTA's scope, like any statute, can test the far reaches in application, we do not have that case before us. The question here is whether unprotected oil field equipment can take or kill migratory birds. It is obvious the oil equipment can. Simply put, the take and kill provisions of the Act are not outside the holding of *Corrow*.

In sum, *Corrow* squarely addressed the mens rea requirement for an MBTA violation, and we are bound by its holding.  *See In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam) ("We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court.").  As a matter of statutory construction, the "take" provision of the Act does not contain a scienter requirement.

### C. Due Process: Notice and Causation

Having concluded the MBTA applies a strict liability standard to the taking or killing of migratory birds, we must address Appellants' additional arguments that the Act is unconstitutional facially and as applied to the conduct in this case. Appellants' broader argument is that the MBTA violates their due process rights because of its scope and application to their conduct.

By way of background, although § 703 is a strict liability crime, a few historical elements are worth remembering.  At common law, crime was a "compound concept" consisting of both an "evil-meaning mind" and an "evil-doing hand."  *Morissette v. United States*, 342 U.S. 246, 251 (1952).  A traditional element of criminal violations thus was that the perpetrator committed the prohibited act with intent or, at minimum, knowledge.  *See* 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 5.5 (2d ed. 2003) ("For several centuries (at least since 1600) the different common law crimes have been so defined as to require, for guilt, that the defendant's acts or omissions be accompanied by one or

-13-

more of the various types of fault . . . .").  The Supreme Court has characterized the scienter requirement as foundational: "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion.  It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil."  *Morissette*, 342 U.S. at 250.

Yet by the middle of the twentieth century, the Supreme Court was confronted with a new category of crimes for which no mens rea was required.  In *Morissette v. United States*, for example, the Supreme Court gave a stamp of approval to regulatory crimes that lacked or had a minimal mens rea element.  *See id.* at 255–56.  But the Court did not do so in unequivocal terms.  The Court reasoned that while the strict liability crimes at that time technically did not require mens rea, the "accused, if he d[id] not will the violation, usually [wa]s in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities."  *Id.* at 256.  Moreover, the "penalties commonly [we]re relatively small," and did not cause "grave damage to an offender's reputation." *Id.*  The Court relied on these principles as recently as its decision in *Staples v. United States*, 511 U.S. 600 (1994), considering whether possession of an unregistered firearm required a scienter element (which it did).

A line of subsequent cases suggest several important limiting principles to strict liability crimes. Two due process limitations are especially relevant here.

First, due process requires citizens be given fair notice of what conduct is criminal. A criminal statute cannot be so vague that "ordinary people" are uncertain of its meaning. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). However, even when a statute is specific about which acts are criminal, our due process analysis is not complete. When, as here, predicate acts which *result* in criminal violations are commonly and ordinarily not criminal, we must ask the fair notice question once again. In the context of laws criminalizing the possession of dangerous items such as drugs or explosives, the Supreme Court has stated when items have characteristics such that a reasonable person would expect the items to be regulated, strict liability for violations of those regulations passes constitutional scrutiny. But when the items lack those special characteristics— that is, when persons would not reasonably foresee the items' regulation—strict liability becomes constitutionally suspect. *See Int'l Minerals*, 402 U.S. at 564–65 ("In *Balint* the Court was dealing with drugs, in *Freed* with hand grenades, in this case with sulfuric and other dangerous acids. Pencils, dental floss, paper clips may also be regulated. But they may be the type of products which might raise substantial due process questions if Congress did not require . . . 'mens rea' . . . .").

-15-

Second, criminalizing acts which the defendant does not cause is unconstitutional, as is criminalizing acts based on the defendant's status. *See Lambert v. California*, 355 U.S. 225, 228 (1957) (striking down as unconstitutional "where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation in a criminal case"). Put differently, the concept of causation limits criminal sanctions to a defendant's conduct—whether the conduct includes affirmative actions or proscribed omissions. *Cf. Robinson v. California*, 370 U.S. 660, 665, 678 (1962) (holding "status" crimes unconstitutional).[4] More pertinent to this case, "[b]y interpreting such public welfare offenses to require at least that the defendant know that he is dealing with some dangerous or deleterious substance" the Supreme Court "avoided construing criminal statutes to impose a rigorous form of strict liability." *Staples*, 511 U.S. at 607 n.3.

---

[4] Another important consideration is the severity of punishment. Appellants did not develop this argument below, but due process suggests some constitutional limits on the penalties contained in strict liability crimes. Severe fines and jail time would warrant a state of mind requirement. *See Engler*, 806 F.2d at 433–34; *United States v. Wulff*, 758 F.2d 1121, 1123, 1125 (6th Cir. 1985); *Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir. 1960). For example, based on *Morissette*'s description of strict liability crimes, the Sixth Circuit invalidated the MBTA's prior *felony* provision, which had no scienter requirement. *See Wulff*, 758 F.2d at 1125. In *Wulff*, the court reasoned that felonies carry a "severe penalty and grave damage to [the defendant's] reputation," and due process requires such a substantial punishment to be given only when "the defendant acted with some degree of scienter." *Id.*

Apollo and Walker make several arguments based on these principles which fall into three general categories: (1) the statute provides inadequate notice of what conduct would violate the MBTA, (2) due process requires they caused an MBTA violation to be guilty of a crime, and (3) the district court erred in applying the preceding principles to them.

## 1. Vagueness: Notice of Statutorily-Prohibited Acts

Apollo and Walker contend the statute allows them to be criminally convicted without fair notice of what conduct constitutes a crime. Their notice argument comes in two varieties. First, the MBTA is unconstitutionally vague because of the multiplicity of actions the statute's language criminalizes. Second, Appellants argue the potential predicate acts that may lead to MBTA violations—innocuous conduct such as driving a car or closing a window—do not provide fair notice of what constitutes criminal behavior. Because this second question is, at bottom, a question of causation, we will leave it to be discussed below with Appellants' other causation arguments.

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357; *see also United States v. Lovern*, 590 F.3d 1095, 1103 (10th Cir. 2009) (quoting *Colautti v. Franklin*, 439 U.S. 379, 390 (1979)) ("Elemental to our concept of due

-17-

process is the assurance that criminal laws must 'give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' and those that fail this test are treated as no laws at all: they are 'void for vagueness.'") "Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement," the "more important aspect" is "that a legislature establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 357–58.

The MBTA is not unconstitutionally vague. It criminalizes a range of conduct that will lead to the death or captivity of protected migratory birds, including to "pursue, hunt, take, capture, [and] kill . . . ." 16 U.S.C. § 703. The actions criminalized by the MBTA may be legion, but they are not vague.

Furthermore, the MBTA's language does not encourage arbitrary enforcement—at least as far as vagueness is concerned. The arbitrariness at which a vagueness challenge takes aim is the "standardless sweep [of a statute's language, which] allows policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen*, 415 U.S. 566, 575 (1974); *see id.* at 569–70 (overturning the conviction of a defendant who "did publicly treat contemptuously the flag of the United States"). In contrast, the MBTA's terms are capable of definition without turning to the subjective judgment of government officers. We thus reject Appellants' vagueness contention.

## 2. Causation: Notice of Predicate Acts

In a variation of their vagueness argument, Appellants also contend the statute does not provide fair notice of prohibited conduct because of the sheer breadth of the Act. They argue the Act applies to innocuous conduct several steps removed from bird deaths or takings. No reasonable person, they contend, would be on notice that those predicate acts are potentially criminal.

The Supreme Court made clear in *Lambert* that reasonable notice is "[e]ngrained in our concept of due process." 355 U.S. at 228. In that case, the Court struck down a state felon registration law because "circumstances which might move one [subject to the law] to inquire as to the necessity of registration [were] completely lacking." *Id.* at 229. The defendant did not have any knowledge of the registration requirement, and the violation—mere presence within the state—"would not be blameworthy in the average member of the community." *Id.* at 227, 229.

More recently, the role of notice for conduct not reasonably foreseen as criminal has played a central role in the Court's statutory interpretation. First, in *Liparota v. United States*, 471 U.S. 419 (1985), the Court examined a statute that criminalized the possession of unauthorized food stamps. Then, in *Staples* the Court examined one which criminalized the possession of certain firearms. 511 U.S. at 602–03. In both cases, the Court found a mens rea requirement as an implicit element to the statutes because strict liability would "criminalize a broad

-19-

range of apparently innocent conduct." *Liparota*, 471 U.S. at 426; *see also*

*Staples*, 511 U.S. at 607 (noting strict liability crimes typically "involve statutes

that regulate potentially harmful or injurious items").

Questions abound regarding what types of predicate acts—acts which lead

to the MBTA's specifically prohibited acts—can constitute a crime.

Conceptually, the constitutional challenge to the criminalization of these

predicate acts can be placed under the rubric of notice or causation. The inquiries

regarding whether a defendant was *on notice* that an innocuous predicate act

would lead to a crime, and whether a defendant *caused* a crime in a legally

meaningful sense, are analytically indistinct, and go to the heart of due process

constraints on criminal statutes.

Recognizing these notice and causation concerns, the district court

attempted to cabin the MBTA's reach by holding the defendants must

"proximately cause" the MBTA violation to be found guilty, and that they did so

here. Aplt. App. at 24 n.16. In other words, the court found the government had

found "'proximate causation' or 'legal causation' beyond a reasonable doubt" by

"showing that trapped birds are a reasonably anticipated or foreseeable

consequence of failing to cap the exhaust stack and cover access holes to the

heater/treater." Aplt. App. at 24 n.16.

The court's proximate cause holding relied heavily on a district court case

construing the MBTA, *United States v. Moon Lake Elec. Ass'n, Inc.*, 45 F. Supp.

-20-

2d 1070 (D. Colo. 1999). In *Moon Lake*, the court considered the liability of a company for migratory bird deaths caused by its high-voltage overhead power lines. The court concluded proximate cause is an "important and inherent limiting feature" to the MBTA, and that liability would attach where the injury "might be reasonably anticipated or foreseen as a natural consequence of the wrongful act." *See id.* at 1085.

We agree with the district court's assessment of proximate cause. Central to all of the Supreme Court's cases on the due process constraints on criminal statutes is foreseeability—whether it is framed as a constitutional constraint on causation (*Lambert*, *Robinson*) and mental state (*International Minerals*), or whether it is framed as a presumption in statutory construction (*Staples*, *Liparota*). When the MBTA is stretched to criminalize predicate acts that could not have been reasonably foreseen to result in a proscribed effect on birds, the statute reaches its constitutional breaking point.

Based on these cases, we agree with the district court's legal conclusion and hold that the MBTA requires a defendant to proximately cause the statute's violation for the statute to pass constitutional muster. *See* BLACK'S LAW DICTIONARY 1225 (6th ed. 1990) (defining "proximate cause" as "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the accident could not have happened, if the injury be one which might be reasonably anticipated or foreseen as a natural

-21-

consequence of the wrongful act"), *In re Antrobus*, 519 F.3d 1123, 1127 (10th Cir. 2008) (Tymkovich, J., concurring) ("If the intervening cause was foreseeable then proximate cause can be established."), *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 713 (1995) (O'Connor, J., concurring) ("Proximate causation is not a concept susceptible of precise definition. . . . We have recently said that proximate causation 'normally eliminates the bizarre,' and have noted its 'functionally equivalent' alternative characterizations in terms of foreseeability and duty.") (internal citations omitted); *see also id.* at 696 n.9, 700 n.13 (majority opinion) (describing "proximate causation and foreseeability" as "ordinary requirements"); *id.* at 712 (O'Connor, J., concurring) ("Strict liability means liability without regard to fault; it does not normally mean liability for every consequence, however remote, of one's conduct.").[5]

### 3. *Proximate Cause As Applied to Appellants*

Applying these principles to Appellants' claims, we reject the contention that the Act violates due process, with one important exception.

---

[5] We emphasize that "foreseeability" in the proximate cause sense is not foreseeability of a legal rule. "We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'" *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S. Ct. 1605, 1611 (2010) (quoting *Barlow v. United States*, 7 Pet. 404, 411 (1833) (opinion for the Court by Story, J.)). Due process constrains the criminalization of predicate acts that do not foreseeably result in a danger that is criminal—here, the taking of protected birds. What knowledge Apollo and Walker had of the MBTA's provisions is irrelevant to our analysis. What is relevant, by contrast, is what knowledge the defendants had or should have had of birds potentially dying in their heater-treaters.

As to Apollo, the record shows it had notice of the heater-treater problem for nearly a year-and-a-half before the bird death resulting in its conviction. Indeed, Apollo admitted at trial that it failed to cover some of the heater-treaters' exhaust pipes as Fish and Wildlife had suggested after the December 2005 inspection. In effect, Apollo knew its equipment was a bird trap that could kill.

In contrast, Walker was charged and convicted for dead birds found in both the April 2007 and April 2008 inspections. Walker contends the conviction arising from the April 2008 inspection should be reversed because on that occasion the bird was found in his heater-treater's louvers, not the exhaust pipe, for which he had no knowledge of a problem. Fish and Wildlife argues it warned Walker of the louver problem when, in its 2007 letter, it admonished Walker to secure all heater-treater cavities in which a protected bird might become trapped. Regardless, we find that once Walker was alerted to protected birds' proclivity to crawl into the heater-treaters' exhaust pipes, it was reasonably foreseeable protected birds could become trapped in other of the heater-treaters' cavities.

The conviction for the April 2007 bird death is a different matter. Walker's testimony—which the Fish and Wildlife agent does not dispute—is that prior to April 2007, he was not aware of problems with heater-treaters in the oil industry or in his specific operations. Fish and Wildlife did not send him a letter about the issue before the April 2007 inspection, and he was not a member of the trade association to which the Service advertised the oil field equipment problem. Nor

was Walker aware of the one television report or newspaper article about heater-treaters. Given the state of this record, we agree no reasonable person would conclude that the exhaust pipes of a heater-treater would lead to the deaths of migratory birds.

In its findings of fact, the magistrate judge found generally that "birds trapped in heater/treaters [were] relatively common in the industry," Aplt. App. at 23, and "oil operators have been aware for some time that bird remains are frequently found in heater/treaters," *id.* at 24 n.15. The magistrate judge did not provide citations in support of these factual conclusions, and our review of the trial record reveals no substantial evidence of pervasive industry knowledge about the heater-treater problem until the Service's educational outreach campaign. To the contrary, a Fish and Wildlife agent testified bird deaths in heater-treaters were "brand new" to the Service before the December 2005 inspections, Aplt. App. at 160, and the fact that the Service did not recommend prosecutions during its educational campaign suggests the issue was not well known.

Therefore, the magistrate judge's finding as to the April 2007 bird death is reversed.

### III. Conclusion

For the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.